661 F.2d 1115
 108 L.R.R.M. (BNA) 2736, 92 Lab.Cas. P 13,089,
7 Media L. Rep. 2229
 Bernard J. HEHEMAN, et al., Plaintiffs-Appellants, Cross-Appellees,
v.
The E. W. SCRIPPS COMPANY, Defendant-Appellee, Cross-Appellant,
and
The Cincinnati Enquirer, A Corporation Organized Under The
Law of Ohio, Defendant-Appellee.
 Nos. 80-3017, 80-3024.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 8, 1981.
Decided Oct. 23, 1981.
As Amended Nov. 10, 1981.
 
 John A. Lloyd, Jr., Barbara Bison Ford, Stanley M. Chesley, Michael Boylan, Cincinnati, Ohio, for plaintiffs-appellants, cross-appellees.
 James W. Hengelbrok, Davis, Hengelbrok & Sachs, Cincinnati, Ohio, John R. Ferguson, Janine H. Coward, Myron L. Dale, Washington, D. C., Jonathan E. Thackeray, Charles T. Price, Baker & Hostetler, Cleveland, Ohio, for defendant-appellee, cross-appellants.
 J. Mack Swigert, Taft, Stettinius & Hollister, Roger Weber, Roger D. Staton, McIntosh, McIntosh & Knabe, Paul R. Reiners, Cincinnati, Ohio, for Cincinnati Enquirer.
 Ronald Rosenberg, George Driesen, Jeffrey Freund, Van Arkel, Kaiser, Gressman, Rosenberg & Driesen, Washington, D. C., for amicus curiae AFL-CIO.
 Frank M. Northam, Hanson, O'Brien, Birney & Butler, Washington, D. C., for amicus curiae American Newspaper Publishers Association.
 Before ENGEL and MERRITT, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 MERRITT, Circuit Judge.
 
 
 1
 In this case we are called upon to decide what effect should be given to an agreement in the newspaper industry guaranteeing lifetime job security for printers. The newspaper terminated the workers covered by the agreement following a partial reorganization and merger. We reverse the decision of the District Court which declined to give full effect to the job security agreement.
 
 I. STATEMENT OF THE CASE
 
 2
 By the late 1960's, new computer technology was beginning to work dramatic changes in traditional relationships between publishers and printers in the newspaper industry. Computers that could "scan" typewritten scripts and directly typeset their words without retyping by printers made it possible for highly skilled linotype operators to be replaced by less skilled employees and computerized equipment.
 
 
 3
 Like other newspapers across the country, the Cincinnati Post and the Cincinnati Enquirer were affected. A letter of understanding signed with a 1973 collective bargaining agreement between the Cincinnati Daily Newspaper Publishers Association, the negotiating agent of the Post and the Enquirer, and the Cincinnati Typographical Union Number Three, which included the printers for both papers, made explicit reference to changes that might be precipitated by the new technology. The letter noted that the parties agreed to defer discussions of the printers' job security until the effects of equipment the newspapers might introduce could be foreseen more precisely. Those discussions led to the execution of what the parties called the "Scanner Agreement" on June 10, 1974. Signed by representatives of the Post and the typographical union, it is quite short. It details new equipment the newspaper would install and describes its effects on full-time employees-called "situation holders." And it appears, through language that lies at the center of the parties' dispute, to guarantee named situation holders lifetime employment in exchange for their acceptance of the new equipment:
 
 Job Security
 
 4
 The Post and Times-Star agrees that all regular situation holders and apprentices who will become regular situation holders, as listed in the Post's priority list dated May 1, 1974, will be continuously employed for the remainder of their working lives by The Post as printers, subject to voluntary terminations, voluntary retirements, disability retirements: as prescribed and defined in F.I.C.A. (Social Security Act) and involuntary terminations for just cause, as provided in Section 21 of the Contract. In case a strike, lockout or "act of God" results in a period of temporary suspension of the employer's composing room operation, the job security will be suspended for such period of temporary suspension of operation only. This Job Security Agreement shall supersede any and all existing contracts and/or agreements between The Post and Times-Star and the Union for said named employees, and is permanent unless cancelled by mutual agreement of both The Post and the Union.
 
 
 5
 During such continuous employment of such an employee by The Post as a printer, he or she will be paid the then applicable wage scale for printers (and covered by any other terms and conditions of employment) which are negotiated and set forth in the existing and any and all succeeding collective bargaining agreements between The Post and the Union. The Post and Times-Star, in addition to its commitment to provide the aforementioned job security to certain named printer employees, has assured the Union that in the future it will continue to make composing room job opportunities available to such employees so that they can continue to perform meaningful and gainful work for The Post. (Emphasis added.)
 
 
 6
 The Scanner Agreement also contains a buyout clause providing from $1000 to $10,000 to those regular situation holders who voluntarily leave the Post within specified time periods. The Agreement provides a lesser guarantee to substitute printers; it guarantees them that they would be offered five days work per week until February 29, 1976. In 1976 a renewal collective bargaining agreement was signed, to be effective until March 1, 1981. It provides that in pertinent part the 1974 Scanner Agreement was to remain in effect, and it provided further incentives for situation holders who chose to retire early.
 
 
 7
 Faced with continuing financial difficulties despite the industry's technological advances, the Post entered into negotiations with the Enquirer with the aim of reducing costs by combining some operations. In September 1977 the newspapers executed a joint operating agreement that provided, inter alia, for the Post to be composed and printed by the Enquirer. On grounds that the Post qualified as a "failing newspaper" under the provisions of the Newspaper Preservation Act, 15 U.S.C. § 1801 et seq. (1976), the Post applied to the Attorney General of the United States for an exemption to antitrust laws that would otherwise prohibit the arrangement between competitors. The joint operating agreement was to take effect after written consent was granted by the Attorney General. Hearings on the application were held before an administrative law judge. They lasted nearly seven weeks and created a transcript over 6000 pages long. Plaintiffs and the International Typographers Union participated in them. The administrative law judge issued a 143-page recommended decision in May 1979. He concluded that the Post was "in probable danger of financial failure," the standard imposed by 15 U.S.C. § 1802(5), and that approval of the joint operating agreement would effectuate the purposes of the Newspaper Preservation Act. The administrative law judge's conclusions were adopted by the Attorney General in November 1979, and the Cincinnati newspapers were thereby granted an exemption from the antitrust laws.
 
 
 8
 The next month the Post's composing room was closed, and all the printers were fired.
 
 
 9
 In December 1977, having received word that they would lose their jobs, more than one hundred situation holders and substitute printers filed this suit in the Southern District of Ohio against the publisher of the Post, E. W. Scripps Co., and the Cincinnati Enquirer, Inc. Jurisdiction was based on § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. They claimed breach of their collective bargaining agreement, and they claimed that the Enquirer, by taking over the Post's printing operations, had tortiously interfered with the lifetime employment provisions of the Scanner Agreement. Their claims for damages for those actions are before this court. Plaintiffs also set out due process and antitrust claims, and Scripps counterclaimed for tortious interference with its negotiating rights. Those claims were dismissed, and their dismissal has not been appealed.
 
 
 10
 In July 1978 the District Court granted summary judgment against the substitute printers. In August 1979 it granted summary judgment against the situation holders on their tortious interference claim against the Enquirer. In November 1979, on cross-motions for summary judgment, the court held that the situation holders were entitled to damages for breach of the Scanner Agreement but that because the Scanner Agreement was dependent on the 1976 collective bargaining agreement, the Scanner Agreement expired when the underlying agreement expired in 1981. The court held that the situation holders had no obligation to mitigate damages for the period running from the time they were discharged until the 1981 expiration. Each of the rulings described in this paragraph is before this court.
 
 
 11
 II. THE LIFETIME EMPLOYMENT GUARANTEE OF THE SCANNER AGREEMENT
 
 
 12
 There can be little dispute about the apparent guarantee of the Scanner Agreement. It provides, quite simply, that all regular situation holders "will be continuously employed for the remainder of their working lives by the Post." The guarantee of continuous employment is subject only to voluntary terminations or retirements, disability retirements, and involuntary terminations for just cause. The guarantee is more than a promise to provide compensation; the newspapers promised "to make composing room job opportunities available ... so that (the printers) can continue to perform meaningful and gainful work." Scripps does not challenge that language on its own terms. It argues, rather, that the apparent guarantee of lifetime employment is now ineffective, for two reasons. It argues first that because the Scanner Agreement explicitly incorporates terms of and is otherwise dependent on collective bargaining agreements between the newspaper and its printers, it therefore expired when the collective bargaining agreement expired, in March 1981. That view was adopted by the District Court. Scripps argues second that the apparent guarantee of the Scanner Agreement is ineffective in the context of the elimination of the Post's printing operations. We reject both of those arguments, and treat them in turn.
 
 
 13
 A. The Effect of the Expiration of the Underlying Collective Bargaining Agreement
 
 
 14
 In holding that the Scanner Agreement's guarantee of employment expired in March 1981 when the underlying collective bargaining agreement expired, the District Court concluded that while the Scanner Agreement "more or less speaks for itself," it was explicitly dependent upon the then-existing and any succeeding collective bargaining agreements for essential conditions of employment, including wages and hours. The court concluded that in the absence of a bargaining agreement supplying such terms, the Scanner Agreement's guarantee was ineffective. The court emphasized that in determining the intent of the parties, it was placing heavy weight on the relation of the $10,000 maximum buyout price (the amount Scripps would pay those who voluntarily left their jobs) to the annual earnings printers would receive were they to retain their jobs. The court apparently inferred from the relatively low buyout price that the Scanner Agreement's apparent promise of lifetime employment could not have been intended to be what its express terms would otherwise imply.
 
 
 15
 We decline to draw that inference. The language of the Scanner Agreement is just too explicit to justify overruling it on the basis of a court's balancing of the value of a lifetime employment contract against a buyout price. The purpose of the buyout provision was not to convince every situation holder to sell his contract rights-neither party to the Scanner Agreement foresaw at the time of its execution that the Post would soon need no printers-but merely to provide an incentive for some to do so. In that objective it was successful; the record indicates that several dozen situation holders exercised their buyout option.
 
 
 16
 Nothing in the Scanner Agreement indicates that the parties intended its guarantees to expire when underlying collective bargaining agreements lapsed. The Scanner Agreement explicitly states that it is to "supersede any and all existing contracts and/or agreements between" the parties "and is permanent unless cancelled by mutual agreement of both" parties. That language cannot be reconciled with Scripps' claim that the parties intended the promise of employment to extend only over the term of negotiated bargaining agreements. It is true, as Scripps points out, that portions of the parties' collective bargaining agreement are incorporated into the Scanner Agreement. But the old and common-sensical rule that "a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified." Guerini Stone Co. v. P. J. Carlin Construction Co., 240 U.S. 264, 277, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916), prevents the incorporation into the Scanner Agreement of the expiration date of the collective bargaining agreement. The Scanner Agreement incorporates the underlying collective bargaining agreement not for determining the duration of employment, but only for determining the "applicable wage scale ... and other terms and conditions of employment."
 
 
 17
 In concluding, as we do, that the intent of the parties was to provide guaranteed employment beyond the duration of any particular collective bargaining agreement, we are not unconscious of the traditional reluctance of courts to construe employment contracts as lifetime guarantees. This Scanner Agreement, however, is simply too precise and too unambiguous to permit any other inference about the intent of the contracting parties. Moreover, the laissez-faire social policies of the nineteenth century which led courts to abandon earlier legal principles encouraging job security for employees have been replaced in this century by congressional, executive and judicial policies encouraging the bargaining for job security. See Note, 93 Harv.L.Rev. 1816, 1824-36 (1980). We also note that much modern scholarly writing on industrial relations argues that job security agreements and customs encourage a higher degree of worker loyalty and hence raise the level of productivity. See, e. g., Roberts, Okamoto & Lodge, Collective Bargaining and Employee Participation in Western Europe, North America and Japan, 75-84 (1979).
 
 
 18
 Scripps argues also that whatever the intent of the parties, the lapse of the underlying collective bargaining agreement means that the Scanner Agreement became unenforceable because of the absence of essential conditions-that is, the wage scale and other terms of employment set out in collective bargaining agreements. It argues that the absence of such terms leaves a court or a jury with no means of fixing Scripps' obligations and therefore renders the Scanner Agreement unenforceable.
 
 
 19
 It is well settled that federal rather than state law governs our analysis of that claim. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Although this Court has recognized that not all principles of general contract law are applicable in the interpretation and construction of collective bargaining agreements, Kellogg Co. v. N.L.R.B., 457 F.2d 519, 524 (6th Cir.), cert. denied, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972), it is usually held that general contract principles of offer and acceptance are applicable in determining whether an enforceable labor agreement exists at all. United Steelworkers v. Bell Foundry Co., 626 F.2d 139, 140 (9th Cir. 1980); F. W. Means & Co. v. N.L.R.B., 377 F.2d 683, 686 (7th Cir. 1967). See Kentucky Skilled Craft Guild v. General Electric Co., 431 F.2d 62, 66-67 (6th Cir. 1970).
 
 
 20
 Though the matter is not entirely free from doubt-no settled standards have evolved from the case law-we conclude that the lapse of the underlying collective bargaining agreement and the resultant absence of negotiated wage terms and other conditions of employment do not render the Scanner Agreement unenforceable. It seems clear beyond argument, as already noted, that the parties intended to bind themselves. They undoubtedly assumed that normal bargaining processes would continue to set the terms of employment; they failed to foresee the complete loss of bargaining power the closing of the Post's printing room caused. As Professor Corbin has concluded, a court should work to avoid finding a contract unenforceable.
 
 
 21
 (i)f it is convinced that the parties themselves meant to make a "contract" and to bind themselves to render a future performance. Many a gap in terms can be filled, and should be, with a result that is consistent with what the parties said and that is more just to both than would be a refusal of enforcement.
 
 
 22
 Corbin on Contracts § 97 at p. 426. The Restatement (Second) of Contracts sets out guidelines of similar effect:
 
 
 23
 A promises B to do a specified piece of work and B promises A to pay a price to be thereafter mutually agreed. The provision for future agreement as to price strongly indicates that the parties do not intend to be bound. If they manifest an intent to be bound, the price is a reasonable price at the time for doing the work.
 
 
 24
 § 32, illustration 8 (Tentative Draft No. 1, 1964). The terms of the Scanner Agreement overcome the presumption that the parties did not intend to be bound. The printers and Scripps were not two otherwise unrelated parties who had agreed to try to reach an agreement on the terms of some future relationship, as in General Motors Corp. v. Keener Motors, 194 F.2d 669, 676 (6th Cir. 1952). The National Labor Relations Act does not, as Scripps points out, compel employers and employees to reach agreement. 29 U.S.C. § 158(d). But the terms of the parties' prior agreement and the requirement of good faith bargaining imposed by § 158(d) do mean that Scripps and its printers were bound together in a way that unrelated parties agreeing to reach an agreement on the terms of an individual service contract are not.
 
 
 25
 Scripps' claim that the Scanner Agreement fails for absence of essential terms is not an easy argument for it to articulate since it is the party who by its breach of contract made unavailable the process by which the contract terms were to be supplied. Corbin cites approvingly the decision in Landow-Luzier Co. v. Grey, 232 N.Y.S.2d 247, 34 Misc.2d 1061 (1962), which held that
 
 
 26
 (A)n exclusive brokerage contract was not too indefinite for enforcement by reason of the fact that "the terms whereby the plaintiff would earn commissions were not spelled out but depended on agreement between defendants (the employer) and the respective third parties. If the terms to be agreed upon never became definite because of the defendants' initially wrongful action in breaching the contract, the defendants cannot plead lack of definiteness as a defense."
 
 
 27
 Corbin on Contracts § 98 at 444. We do not believe the District Court on remand will have serious difficulty in this case, after giving the parties an opportunity to be heard on the issue, in filling in missing contract terms and in fashioning a remedy for the breach in accordance with general principles of damages under Ohio law.
 
 
 28
 B. The Effect of the Closing of the Post's Printing Facilities
 
 
 29
 Scripps' second argument in support of its claim that the apparent lifetime guarantee of the Scanner Agreement is no longer effective is that its obligations toward plaintiffs ended when its printing operations shut down. Its argument, essentially, is that the Scanner Agreement was not meant to apply in such a context. It argues that any responsibilities it had toward plaintiffs, therefore, ended December 6, 1979, the date printing operations ended at the Post. The District Court rejected the argument, and we agree.
 
 
 30
 It is clear, as Scripps urges, that neither federal labor law nor ordinary collective bargaining agreements compel an employer to maintain in operation all or any part of its business. Fraser v. Magic Chef-Food Giant Markets, Inc., 324 F.2d 853 (6th Cir. 1963). But plaintiffs' claim does not rest on any alleged violation of labor law; it rests instead solely on the terms of the Scanner Agreement. The Supreme Court has recognized the distinction between, on the one hand, collective bargaining agreements that set conditions of employment but guarantee no individual a job, and on the other, contracts of employment that do guarantee jobs. J. I. Case Co. v. N.L.R.B., 321 U.S. 332, 334-35, 64 S.Ct. 576, 578-579, 88 L.Ed. 762 (1944). The Supreme Court noted that "in rare cases" collective bargaining agreements are contracts of employment, and the explicit language of the Scanner Agreement makes clear that it is, as the District Court concluded, among such cases.
 
 
 31
 It may be the case-a point we need not decide-that Scripps would not be liable to plaintiffs were it to go out of business entirely. Plaintiffs concede that the Scanner Agreement was not meant to apply in the event of complete financial failure. But as the District Court concluded, the Post has not in any meaningful sense gone out of business. It is still being published; it is still producing revenue. If it had gone completely out of business, all parties involved in the organization-shareholders, managerial officers, editorial employees, and printing employees-would have borne some loss. By closing down its printing operations without compensating plaintiffs, Scripps has sought to force them to bear a disproportionate share of the losses caused by the Post's financial difficulties.
 
 
 32
 Scripps points out, and plaintiffs concede, that the focus of the Scanner Agreement was the protection of the printers against the effects of new technology. But Scripps claims that the merger of printing operations at the Enquirer's place of business is outside the scope of the Scanner Agreement and, therefore, led to a loss of employment for which the Agreement provides no remedy. But Scripps does not deny that technological advances underlay the consolidation of printing operations. Uncontradicted deposition testimony by the chief executive officer of the Enquirer establishes that it was technological change that allowed his paper's printers to produce an additional paper without further hirings. Technological advancement seems clearly to be a factual and proximate cause of the harm plaintiffs have suffered. The site of the technological advance-whether at the Post, as the Scanner Agreement undoubtedly contemplated, or at the Enquirer, as in fact occurred-does not affect that conclusion.
 
 
 33
 We, therefore, reject Scripps' arguments that we should not give effect to the plain language of the Scanner Agreement guaranteeing job security for printers, and we reverse the decision of the District Court that Scripps' liability is limited to a period that ends with the termination of the last collective bargaining agreement.
 
 III. MITIGATION OF DAMAGES
 
 34
 The District Court held that plaintiffs need not mitigate damages for the fifteen-month period over which it held Scripps to be liable. It held that the printers "need not seek or accept other employment," though if they did receive other remuneration the money received would serve to reduce their damage award. We also reverse the decision below on the issue of mitigation.
 
 A. Availability of Specific Performance
 
 35
 We dispose as a preliminary matter of plaintiffs' contention that if mitigation is demanded of them, they are entitled instead to specific performance of the Scanner Agreement. In rejecting that argument, we need not rely on plaintiffs' probable waiver of that remedy-they represented to the District Court that they would not seek specific performance (App. 109, 453-54), and no ruling on the remedy was issued-in concluding that specific performance is unavailable to them. Instead, we rely primarily on provisions of the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq., which we conclude deprives the court of jurisdiction to issue an order for specific performance.
 
 The broad command of § 101 is that
 
 36
 (n)o court of the United States ... shall have jurisdiction to issue any ... injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this chapter; nor shall any ... injunction be issued contrary to the public policy declared in this chapter.
 
 
 37
 The more specific provisions of § 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, provide that
 
 
 38
 (n)o court of the United States shall have jurisdiction to issue any ... injunction in any case involving or growing out of any labor dispute to prohibit any person ... from ...
 
 
 39
 (a) ... refusing ... to remain in any relation of employment....
 
 
 40
 Though the Act was principally directed toward abuses of injunctions directed against union activities, e. g., Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 250-51, 90 S.Ct. 1583, 1592, 26 L.Ed.2d 199 (1970), the terms of its broadest prohibitions do not distinguish between injunctions against labor and injunctions against management. The Court has recognized that as the labor movement has grown in power, congressional attention has shifted from protection of labor unions to encouragement of collective bargaining and other techniques for peaceful resolution of industrial disputes. The shift has occurred without revision of such older statutes as the anti-injunction provisions of Norris-LaGuardia, thus throwing upon the courts the task of accommodating and reconciling older statutes with newer ones, among the latter § 301 of the Labor Management Relations Act. Id.
 
 
 41
 The result has been the creation of narrow exceptions to the broad anti-injunction provisions of the Norris-LaGuardia Act, principally the grant of specific performance against management of grievance arbitration clauses, Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), and against unions of no-strike provisions, the quid pro quo of arbitration clauses. Boys Markets, supra, 398 U.S. at 248, 90 S.Ct. at 1591. In Buffalo Forge Co. v. Steelworkers, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), the Court, in refusing to extend the scope of Boys Markets, emphasized the continuing vitality of Norris-LaGuardia:
 
 
 42
 The driving force behind Boys Markets was to implement the strong congressional preference for the private dispute settlement mechanisms agreed upon by the parties. Only to that extent was it held necessary to accommodate § 4 of the Norris-LaGuardia Act to § 301 of the Labor Management Relations Act and to lift the former's ban against the issuance of injunctions in labor disputes.
 
 
 43
 ....
 
 
 44
 (A)side from the enforcement of the arbitration provisions of such contracts, within the limits permitted by Boys Markets, the Court has never indicated that the courts may enjoin actual or threatened contract violations despite the Norris-LaGuardia Act. In the course of enacting the Taft-Hartley Act, Congress rejected the proposal that the Norris-LaGuardia Act's prohibition against labor-dispute injunctions be lifted to the extent necessary to make injunctive remedies available in federal courts for the purpose of enforcing collective-bargaining agreements.
 
 
 45
 428 U.S. at 407, 409, 96 S.Ct. at 3147, 3148. The Court has not moved beyond the specific areas arising in Lincoln Mills and Boys Markets in carving exceptions to the prohibitions of the Norris-LaGuardia Act. It has not treated the issue facing us here: whether specific performance of a collective employment contract is a remedy available to employees.
 
 
 46
 Lower courts have encountered the issue with remarkable infrequency. Apparently just two courts of appeals have treated issues at all analogous. In each case the court has granted an injunction on the ground that the activity sought to be enjoined did not appear on the list of specifically enumerated prohibitions contained in the Norris-LaGuardia Act at 29 U.S.C. § 104. In Retail Clerks Union v. Alfred M. Lewis, Inc., 327 F.2d 442 (9th Cir. 1964), the court reversed a district court's dismissal of a suit asking an employer to comply with a cost of living wage adjustment provision contained in a collective bargaining agreement. The court held that the Norris-LaGuardia Act did not deprive it of jurisdiction because no specific provision of § 104 of the Act was applicable. Accordingly, the court concluded, the case did not involve "the type of 'labor dispute' to which Norris-LaGuardia is directed." Id. at 448. In Parks v. International Brotherhood of Electrical Workers, 314 F.2d 886 (4th Cir.), cert. denied, 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963), the court concluded in a suit by a local union and its members against its international parent union that Norris-LaGuardia should not prevent specific performance of an agreement between them. Relying on Lincoln Mills, in which the Court had concluded that the Act was not aimed at preventing specific performance of arbitration agreements, the Fourth Circuit concluded that the "injunctive relief sought by (the local union)-restoration of its charter, etc.-may also be said not to be 'a part and parcel of the abuses against which the Act,' as indicated by the specific matters listed in (§ 104), was directed." Id. at 919. In the instant case, unlike those two cases, the relief sought is among the areas listed in § 104: the printers ask the court "to prohibit" Scripps from "refusing ... to remain in (a) relation of employment...." 29 U.S.C. § 104(a). In a case involving issues quite similar to those in this case, at least one court has reached the conclusion that the Act bars equitable relief. In Pacific Log Scalers Ass'n v. Columbia River Log Scaling and Grading Bureau, 88 L.R.R.M. 2974, 76 Lab.L.Rep. (CCH) P 10,703 (D.Or.1975), the plaintiff union sought, inter alia, reinstatement of an employee discharged in violation of a collective bargaining agreement in a § 301 suit. The court granted a motion to strike those portions of the complaint that sought equitable relief, concluding that the Norris-LaGuardia Act prevented such relief. We reach the same conclusion.
 
 
 47
 Even if the Norris-LaGuardia Act did not prevent the grant of specific performance, traditional principles of contract law would. The ordinary rule is that employees are not entitled to specific performance against employers who, by discharging them, breach employment contracts. Loeb v. Textron, Inc., 600 F.2d 1003, 1023 n.34 (1st Cir. 1979); D. Dobbs, Law Of Remedies § 12.25 at 929 (1973); Restatement Of Contracts § 379, illustration 2. The traditional justifications for refusals to award specific performance are applicable here. First, an award of damages can adequately compensate plaintiffs; they have admitted as much before the District Court (App. 109, 453-54). Second, a grant of specific performance could require the courts to supervise the employer/employee relationship over the length of plaintiffs' lifetime, a task for which the courts are poorly suited. Third, because there is not enough printing work to occupy both the Enquirer's printers and plaintiffs, a grant of specific performance would lead to considerable waste. Each of these considerations supports a denial of plaintiffs' belated claim of a right to specific performance.
 
 B. Mitigation of Damages
 
 48
 The District Court held as a matter of contract law that plaintiffs need make no effort to mitigate damages. It decided that their need to remain available for a possible recall made seeking and holding any alternative job too difficult. We conclude, however, that this case does not fall within the narrow exceptions courts have created to the nearly universal requirement that plaintiffs mitigate damages.
 
 
 49
 The mitigation requirement is embedded in both labor law and contract law. The general rule in labor law, developed primarily in cases in which discharged employees seek backpay, is that
 
 
 50
 an employee must at least make reasonable efforts to find new employment which is substantially equivalent to the position (he lost) ... and is suitable to a person of his background and experience.
 
 
 51
 N.L.R.B. v. Madison Courier, Inc., 472 F.2d 1307, 1318 (D.C.Cir.1972) (citations and original emphases omitted). See N.L.R.B. v. Southern Silk Mills, 242 F.2d 697, 700 (6th Cir. 1957). The rule in contract law is the same, see, e. g. D. Dobbs, Law Of Remedies § 12.25 at 925 (1973); its justification, as described by Professor Corbin, is that a contrary rule would involve "unreasonable economic waste." Corbin on Contracts § 1041 at 260. In both contract and labor law, the burden of proving a failure to mitigate rests on the breaching employer. E. g., Madison Courier, supra, 472 F.2d at 1318; Corbin § 1041 at 261.
 
 
 52
 Courts have refused to demand efforts to mitigate damages in some contexts, as when the employer has bargained in bad faith. Food Handlers Local 425 v. Valmac Industries, Inc., 528 F.2d 217, 219 (8th Cir. 1975). In the present case, however, while it is clear that Scripps has breached its agreement with its printers, there is no allegation and no evidence that the negotiation of the agreement involved bad faith. Nor is it sufficient to argue, as do plaintiffs, that demanding mitigation will encourage future breaches of similar agreements. The same can be said of any case in which mitigation of damages is required.
 
 
 53
 It is clear that determining, through application of a mitigation rule, the proper damage award for future as well as past injuries will not be a simple task. And we decline, at this point, without benefit of factual findings or any analysis of the legal issues by the lower court, to fashion applicable rules in the abstract. Though difficult, the problem should not prove unmanageable. As the Supreme Court noted in Pierce v. Tennessee Coal, Iron and Railroad Co., 173 U.S. 1, 19 S.Ct. 335, 43 L.Ed. 591 (1899), where it held that a discharged employee could recover damages for breach of a lifetime employment contract,
 
 
 54
 (t)he difficulty and uncertainty of estimating damages that the plaintiff may suffer in the future is no greater in this action of contract, than they would have been if he had sued the defendant, in an action of tort....
 
 
 55
 173 U.S. at 16, 19 S.Ct. at 341. The Court further noted that in figuring such damages, deduction should "of course" be made for any sum the plaintiff "might earn in the future." Id. Conscious of the infeasibility of monitoring a month-by-month or year-by-year assessment of damages yet aware of the difficulties inherent in calculating future damages, we remand for analysis and application of principles of mitigation that will adequately compensate plaintiffs as they vindicate the public policies of federal labor law. Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 192-98, 61 S.Ct. 845, 851-854, 85 L.Ed. 1271 (1941).
 
 IV. THE TORT CLAIM AGAINST THE ENQUIRER
 
 56
 Plaintiffs argue on appeal that the District Court erred in granting summary judgment against them on their tort claim against the Enquirer. They argue that the Enquirer tortiously interfered with their Scanner Agreement contract rights by negotiating a provision in the joint operating agreement that provided that "the Enquirer, using its own employees and not employees of Scripps-Howard or the Post, shall ... perform all operations ... involved in producing" the newspapers. The court below concluded that the contract between the Post and the Enquirer would "as a practical matter ... prevent the Post from carrying out its contract with the printers," and that the Enquirer knew it would have that effect (App. 579). The court found, however, that there was "no shred of evidence in this case, nor could there be, that there was any personal animosity on behalf of either contracting party toward the printers" (App. 579). It held that under Ohio law the advancement of bona fide economic interests privileges any interference not tainted by unlawful means and concluded that "there is no question of material fact but that the Enquirer had an economic interest which it was advancing ... by means lawful in themselves...." (App. 583). We hold, as did the court below, that the Enquirer is not liable to plaintiffs. We reach that conclusion, however, by reasoning somewhat different from that adopted by the District Court.
 
 
 57
 The structure of the tort of interference with contractual relations is incompletely outlined in Ohio case law, which governs plaintiffs' pendent claim. The most recent treatment of the problem by an Ohio Court of Appeals indicates that the state has adopted the framework set out in the Restatement of Torts. The principle of such actions is that
 
 
 58
 one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another, or perform a contract with another is liable to the other for the harm caused thereby.
 
 
 59
 Juhasz v. Quik Shops, Inc., 55 Ohio App.2d 51, 379 N.E.2d 235, 238 (1977), citing Restatement of Torts § 766 (1939). The guidelines for determining whether a privilege exists are set out in the Restatement as well. The factors are
 
 
 60
 (a) the nature of the actor's conduct,
 
 
 61
 (b) the nature of the expectancy with which his conduct interferes,
 
 
 62
 (c) the relations between the parties,
 
 
 63
 (d) the interests sought to be advanced by the actor and
 
 
 64
 (e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand.
 
 
 65
 379 N.E.2d at 238-39, quoting the Restatement of Torts § 767 (1939). The Restatement (Second) of Torts would add consideration of the actor's motive to the list. It is clear in Ohio, however, that malice, in the sense of "personal ill will, spite, or hatred" on the part of the interferor is not an essential element of the cause of action. Reichman v. Drake, 89 Ohio App. 222, 100 N.E.2d 533, 537 (1951). And it is clear that "malicious inducement (is not to) be inferred from the mere fact that a third party enters into a contract with one of two contracting parties with knowledge" of the existing contract. Horth v. American Aggregates Corp., 35 N.E.2d 592, 599 (Ohio App. 1940).
 
 
 66
 In challenging the District Court's grant of summary judgment against them, plaintiffs argue as a threshold matter that disputed issues of material fact render summary judgment inappropriate. The traditional rule, as set out in Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979), cert. dismissed, Hudson v. Smith, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979), is that summary judgment is appropriate only when the movant demonstrates conclusively that there exists no genuine issue of material fact, all evidence and inferences drawn therefrom having been construed in the light most favorable to the opposing party. As noted in that case, "cases involving questions of motive or intent are normally not suited to disposition on summary judgment." Id. at 66.
 
 
 67
 As suggested by negative implication in the quoted language, however, and as explicitly noted by commentators, see 6 Pt. 2 Moore's Federal Practice P 56.17(1) at 690, no issue is immune from summary judgment. We conclude that neither of the alleged areas of material disputed fact identified by plaintiffs should prevent its grant in this case. Whether the Enquirer acted out of malice toward plaintiffs, one area of dispute plaintiffs identify, does not prevent the grant of summary judgment. While the Enquirer does not deny that it was aware of Scripps' contractual obligations to its printers, no reasonable argument can be built on the claim that its negotiation of the joint operating agreement was motivated by spite or ill will against parties with whom it had never dealt. No evidence of such malice appears in depositions already taken, and no purpose would be served by considering further evidence on the issue. Nor, we conclude, would any purpose be served by further development of such evidence as which newspaper first approached the other on the possibility of conducting joint operations, or which newspaper held the balance of bargaining power, or how firmly the Enquirer insisted on its right to employ its own printers. We assume in reviewing the grant of summary judgment that the Enquirer did negotiate from a superior bargaining position and did use its bargaining power to exact from Scripps the right to employ its own printers. We conclude that a weighing of the factors Ohio courts have identified as significant must lead to a conclusion of no liability in tort for the Enquirer's actions.
 
 
 68
 An analysis of the factors identified by the Restatement of Torts and by Ohio courts as being significant to a determination of tortious interferences with contract supports the conclusion of no liability on the part of the Enquirer. Two factors are salient. The first is the clear absence of malicious intent on the part of the Enquirer; its purpose seems clearly to have been the avoidance of the burden of the Post's contractual obligations rather than the deprivation of plaintiffs' rights. Had Scripps been able to provide plaintiffs with other employment, the Enquirer's interests would have been equally served. Given its legitimate desire to use labor efficiently, the Enquirer was effectively faced with a choice between its own and Scripps' printers. The second and more significant justification of the actions taken by the Enquirer derives from the wider social interests they serve. As declared by Congress "(i)n the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts" of the country, "the public policy of the United States (is) to preserve the publication of newspapers in any city, ... where a joint operating arrangement (is) entered into because of economic distress...." 15 U.S.C. § 1801. Again the issue is not whether the Enquirer's motives were altruistic; presumably they were not. But we are nonetheless hesitant to impose liability on it and for an act consistent with so clear a statement of congressional purpose.
 
 V. SUBSTITUTE PRINTERS
 A. Claims of Eight Substitutes
 
 69
 The claims of the eight substitute printers discharged by Scripps, like the claims of the full-time printers, rest upon the Scanner Agreement and the collective bargaining agreement negotiated in 1976. Beyond that the claims have little in common; neither the Scanner Agreement nor succeeding collective bargaining agreements treat substitute printers and full-time printers alike. The Scanner Agreement provides, in pertinent part, that
 
 
 70
 The Post guarantees that all substitutes listed by name ... will be offered five days work per week for the time period from June 10, 1974 to February 29, 1976, and will receive all Contract Benefits ... as applies to situation holders.
 
 
 71
 (App. 66). The February 29, 1976 deadline was the expiration date of the underlying collective bargaining agreement setting terms and conditions of employment. It is undisputed that Scripps fulfilled the terms of that obligation. On November 24, 1976 the printers' union signed a renewal of that collective bargaining agreement, retroactively effective from March 1, 1976 until 1981. That agreement has already been discussed at some length, and it provides, without special reference to the substitute printers, that the Scanner Agreement, with exceptions not relevant here, "remains in effect" (App. 96).
 
 
 72
 In granting summary judgment against the substitute printers, the District Court concluded that the "remains in effect" language in the 1976 agreement could refer only to "obligations not theretofore fully performed" and could have been intended only to insure the survival of unperformed obligations. Although the interpretation of the language adopted by the District Court is most likely the appropriate one, we conclude that the language is not so unambiguous as to justify the issuance of summary judgment against the substitute printers.
 
 
 73
 In deciding the issue, we, of course, observe the traditional rule that summary judgment is appropriate only when the movant demonstrates conclusively that there exists no genuine issue of material fact, all evidence and inferences drawn therefrom having been construed in the light most favorable to the opposing party. Smith v. Hudson, 600 F.2d 60, 63 (6th Cir.), cert. dismissed, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). Although the question of whether the language of a written agreement is ambiguous is one of law, the interpretation of such language, once held to be ambiguous, is a factual issue turning on the intent of the parties. Wright & Miller, Federal Practice and Procedure: Civil § 2730, pp. 584-87. As such, it is an issue not susceptible to disposition by summary judgment on the basis of the present record. E. g., id. at 584; Aetna Casualty & Surety Co. v. Giesow, 412 F.2d 468, 471 (2d Cir. 1969); Cram v. Sun Insurance Office, Ltd., 375 F.2d 670, 674 (4th Cir. 1967).
 
 
 74
 The meaning of the relevant language in the 1976 collective bargaining agreement is sufficiently ambiguous to warrant further factual inquiry; the interpretations set out by both the substitute printers and Scripps are plausible ones. The deposition testimony and other evidence offered by the parties thus far is inconclusive. Deposition testimony offered by the substitute printers to the effect that Scripps continued to offer them five days of work per week is consistent with their claim but not dispositive of Scripps'. An affidavit relied upon by Scripps states the terms and applicable dates of the guarantee of the Scanner Agreement but asserts nothing as to its possible extension (App. 192a-b).
 
 B. Claim of Raymond P. Hughes
 
 75
 Plaintiff Raymond P. Hughes occupied a unique status. Approximately one month before the execution of the Scanner Agreement, he was discharged for cause from his position as a full-time printer. His name was nonetheless included in the Scanner Agreement's list of full-time printers, apparently because arbitration proceedings for his discharge were still pending. Eventually the discharge was upheld in arbitration. One explicit exception to the Scanner Agreement's guarantee of employment for full-time printers is terminations for just cause, and Hughes accordingly makes no claim as a full-time printer. He argues, however, that because he was entitled to maintain and did maintain the status of substitute printer following his discharge as full-time printer, he is therefore entitled to whatever rights the Scanner Agreement and succeeding collective bargaining agreement provide to substitute printers. The District Court rejected that argument and granted summary judgment against him. It concluded that the reason for the inclusion of Hughes in the list of regular situation holders was clearly the pendency of the arbitration proceedings, and that once Hughes lost the rights of a regular situation holder he lost all rights the Scanner Agreement might otherwise have provided him.
 
 
 76
 We again conclude that the issue is not so clear as to justify disposition by summary judgment, relying on grounds analogous to those set out in our discussion of the claims of the substitute printers. Both parties' interpretations of the rights the Scanner Agreement provides to Hughes are plausible. Hughes claims, and Scripps has not denied, that he was entitled to become and did become a substitute printer following his termination as a full-time printer. If that is so, the failure of the Scanner Agreement to include him on the list of those entitled to the lesser rights of substitute printers would seem to be an accident of the timing of his arbitration proceeding. If so, the denial to him of the rights of substitutes would seem to be contrary both to notions of fairness and to the probable intent of the parties drafting the Scanner Agreement. Scripps has submitted nothing that would establish the contrary. An affidavit submitted by its agent notes the fact of Hughes' termination as a full-time printer and states that he "subsequently 'slipped up' as a substitute printer at the Post, and holds that position today" (App. 192b). The phrase "slipped up" is probably one to which the parties attach a precise meaning; that meaning, however, does not appear in the record.
 
 
 77
 Accordingly, the decision of the District Court is reversed and the cause is remanded for further proceedings consistent with this opinion.