62 F.3d 1417
 151 L.R.R.M. (BNA) 2736
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Albert AKINS, et al., Plaintiffs-Appellants,
Tony Brock, et al., Plaintiffs,
v.
ZENECA, INC.; Rhone-Poulenc, Inc.; Rhone-Poulenc Basic
Chemicals Co,; Stauffer Chemical Co.; International Union of
Operating Engineers, AFL-CIO; Local 912 International Union
of Operating Engineers, AFL-CIO, Defendants-Appellees.
 No. 94-5132.
 United States Court of Appeals, Sixth Circuit.
 July 27, 1995.
 
 Before: CONTIE, MILBURN and SILER, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff Albert Akins and 39 co-plaintiffs, all members of the Local 912 International Union of Operating Engineers ("Local 912") and former employees of Rhone-Poulenc, Inc. ("R-P"), challenge the district court's grant of summary judgment, Fed. R. Civ. P. 56(c), and/or judgment as a matter of law, Fed. R. Civ. P. 50, to Defendants R-P, Zeneca, Inc. (formerly ICI Americas Inc. and hereafter "ICIA"), the International Union of Operating Engineers ("IUOE"), and Local 912 on plaintiffs' claims under Sec. 301 of the Labor Management Relations Act and state law. For the reasons stated herein, we affirm the decision of the district court.
 
 I.
 
 2
 As determined by the district court, the following facts are not in dispute:
 
 
 3
 Stauffer Chemical Company owned and operated two chemical plants in Mt. Pleasant, Tennessee. One, which is commonly called the "furnace plant," produced phosphorous. The other, which is commonly called the "organic plant," produced herbicides and pesticides. Workers at both plants were represented by Local 912. These workers constituted a single collective bargaining unit with one common seniority list. One collective bargaining agreement ("CBA") governed the terms of employment for both plants.
 
 
 4
 In 1982, Stauffer proposed splitting the single collective bargaining unit into two separate units. Local 912 strongly objected to the proposal. However, after negotiations, the parties reached an agreement. Local 912 consented to divide the furnace plant and the organic plant employees into separate bargaining units, provided that Stauffer would permit workers at each plant to "cross-bump" to the other plant. This meant in the event of layoff at one plant, a senior employee from that plant could transfer to the other plant and displace a junior employee. The parties memorialized their bargain in a memorandum of agreement, commonly referred to as the "cross-bumping agreement."
 
 
 5
 At roughly the same time that they executed the cross-bumping agreement, Local 912 and Stauffer entered into two new CBAs: one for the furnace plant and the other for the organic plant. Each CBA provided that the cross-bumping agreement "shall be considered as supplemental to the [CBA] between the parties ... and shall remain in full force and effect during the period of such [CBA] unless modified by the parties in writing." These CBAs remained in effect for three years.
 
 
 6
 In 1985, Local 912 and Stauffer negotiated new three-year CBAs for the two plants, each providing that the cross-bumping agreement was supplemental and that it would remain in effect for the duration of the current CBAs. In July 1987, prior to the expiration of the 1985 CBAs, various corporate affiliates of a multinational corporation, Imperial Chemical Industries, P.L.C., purchased Stauffer. One of these affiliates retained the organic plant and merged into defendant ICIA. The other affiliates operated Stauffer's other facilities for a short period before selling them to unrelated companies near the end of 1987. Defendant R-P purchased the furnace plant in December 1987.
 
 
 7
 Upon the expiration of the 1985 CBAs, each of the new owners negotiated its own CBA with Local 912. During the negotiations, ICIA and R-P Basic tried to persuade Local 912 to delete all references to the cross-bumping agreement. The union, however, refused. The 1988 CBAs for both companies stated that the cross-bumping was considered supplemental and that it would remain in effect for the duration of the CBAs.
 
 
 8
 In June 1990, R-P Basic announced that it was going to close the furnace plant and that layoffs were expected to begin in February 1991. Anticipating that the organic plant employees and ICIA would seek to rescind the cross-bumping agreement, Local 912's business manager, James Kincade, sought the advice of the IUOE. In a letter dated June 26, 1990, Kincade wrote to Frank Hanley, General President of the IUOE, and inquired whether Section XXIV(11)(e) of the IUOE Constitution, which requires that proposed modifications to CBAs be "approved by the membership affected," would permit the organic plant bargaining unit to rescind the cross-bumping agreement without the consent of the furnace plant bargaining unit. President Hanley's reply did not answer Kincade's question.
 
 
 9
 On October 16, 1990, pursuant to the advice of its local counsel, Local 912 filed a declaratory judgment action in this Court against ICIA and R-P Basic, asking the district court to "declare whether employees from the R-P Furnace Plant have the right to bump employees in the ICI[A] organic plant pursuant to the [cross-bumping] agreement."
 
 
 10
 After commencement of the declaratory judgment action, R-P Basic indicated for the first time that the layoffs might be delayed. In fact, the first layoffs did not begin until July 1991. As the expiration of the organic plant CBA approached, the furnace plant employees became increasingly anxious that the organic plant employees would delete the cross-bumping agreement from their new CBA with ICIA. Nevertheless, Kincade assured them that nothing that ICIA might do could affect their right to transfer pursuant to the cross-bumping agreement.
 
 
 11
 On June 11, 1991, ICIA and Local 912 entered into a new CBA. As the furnace plant employees had feared, the parties deleted all references to the cross-bumping agreement. At a meeting with the furnace plant employees, Kincade informed them that he decided that ICIA could affect their transfer rights. He also indicated that Local 912 had dismissed the declaratory judgment action as moot. Upset with this news, several of the plaintiffs wrote to Frank Hanley, General President of the IUOE, seeking advice. Hanley responded that the matter was purely local and did not concern the IUOE.
 
 
 12
 In August, 1991, subsequent to some layoffs, Kincade assisted in filing a grievance with R-P. R-P denied the grievance, insisting that it had fulfilled all of its obligations under the the cross-bumping agreement. R-P then provided forms on which employees could request a job with ICIA and submitted the forms to ICIA. ICIA, however, returned the forms.
 
 
 13
 In November 1991, plaintiffs sued the defendants for violations of Sec. 301 of the LMRA, 29 U.S.C. Sec. 185; the union constitution; and state law. The district court granted summary judgment in full to ICIA and in part to the remaining defendants, thereby disposing of plaintiffs' state law claims and a number of other theories. The case then proceeded to trial. After plaintiffs concluded their proof, the remaining defendants moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b).[1] The district court granted defendants' motion.
 
 II.
 
 14
 This court reviews a grant of summary judgment de novo. Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). All reasonable inferences must be made in favor of the non-moving party in determining whether a genuine issue of material fact exists. Kunz v. United Food Commercial Workers, Local 876, 5 F.3d 1006, 1008-09 (6th Cir. 1993). Likewise, this court reviews a grant of judgment as a matter of law de novo. This court determines whether, after viewing the evidence in the light most favorable to the non-moving party, "there is a complete absence of pleading or proof on an issue or issues material to the cause of action or ... no controverted issues of fact upon which reasonable men could differ." Kitchen v. Chippewa Valley Schs., 825 F.2d 1004, 1015 (6th Cir. 1987). If so, judgment as a matter of law must be granted to the moving party.
 
 
 15
 A) Plaintiffs' State Law Claims.
 
 
 16
 Plaintiffs contend that: (1) R-P and ICIA induced the unions to "breach [their] contractual and trust obligations to plaintiffs"; and (2) defendants conspired to deprive plaintiffs of their "vested contractual rights." Tennessee courts recognize both a common law and statutory cause of action for civil conspiracy. Both require proof of a "combination between two or more persons to accomplish by concert an unlawful purpose or to accomplish a purpose, not in itself unlawful, by unlawful means." Hardin v. Caldwell, 695 S.W.2d 189, 191 (Tenn. Ct. App. 1985). Further, both require plaintiffs to first prove the existence of an underlying tort. Forrester v. Stockstill, 869 S.W.2d 328, 330 (Tenn. 1994). Failure to do so precludes recovery for civil conspiracy. See id. ("if the [underlying] claim fails, then the claim for conspiracy must also fail, for '[i]t cannot be that a conspiracy to do a thing is actionable where the thing itself would not be."' (citing Felts v. Paradise, 158 S.W.2d 727, 729 (Tenn. 1942)).
 
 
 17
 To this end, plaintiffs argue that defendants tortiously interfered with certain contracts, a claim that requires plaintiffs to establish that: (1) a legal contract existed; (2) the wrongdoer knew of the contract; (3) the wrongdoer intended to induce breach; (4) the wrongdoer acted with malice; (5) a breach occurred; (6) the wrongdoer caused the breach; and (7) damages resulted. Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n, 835 S.W.2d 25, 29 (Tenn. Ct. App. 1992). A party will not be held liable under this tort for interfering with a contract to which it was a party. Koehler v. Cummings, 380 F.Supp. 1294, 1313 (M.D. Tenn. 1971).
 
 
 18
 Plaintiffs cannot support their claim of tortious interference with contract, as Local 912 and R-P are parties to the contracts at issue and plaintiffs failed to prove that any defendant acted with actual malice. See Testerman v. Tragesser, 789 S.W.2d 553, 556-57 (Tenn. Ct. App. 1989)(failure to prove actual malice precludes a claim for tortious interference with contract). As the underlying tort fails, plaintiffs' claim for civil conspiracy fails as a matter of law. The district court, therefore, properly dismissed plaintiffs' state law claims.
 
 
 19
 B) Plaintiffs' Hybrid Sec. 301 Claim against R-P and Local 912.
 
 
 20
 Plaintiffs brought a hybrid Sec. 301 cause of action against R-P and Local 912, contending that R-P breached its obligations under the 1988 CBA by failing to obtain jobs for the plaintiffs in the organic plant, and that Local 912 breached its duty of fair representation by failing to pursue a grievance against R-P. In order for an employee to recover in a hybrid Sec. 301 suit against his employer or union, the employee must show both that his employer breached the CBA and that the union breached its duty of fair representation. Adcox v. Teledyne,Inc., 21 F.3d 1381, 1386 (6th Cir.), cert. denied, 115 S.Ct. 193 (1994); Kunz, 5 F.3d at 1009. Failure to establish both precludes recovery against either party.
 
 
 21
 The district court granted R-P and Local 912 judgment on plaintiffs' hybrid Sec. 301 claim, stating as its basis the following:
 
 
 22
 Now the court has determined that, as a matter of law, the defense of impossibility, or what is sometimes called the Doctrine of Impracticability, governs the disposition of this first claim. In this case, as a result of the change of ownership of the two plants, it simply became impossible for Rhone Poulenc to compel another corporation to take its employees.
 
 
 23
 This ruling is erroneous. As of 1988, when R-P agreed to include by reference the 1982 cross-bumping agreement in the CBA, it knew it could not "perform"[2] under the contract, in the sense that R-P could not force ICIA, a separate corporation with which it had no contractual ties, to abide by the cross-bumping agreement. This knowledge precludes R-P's defense of impossibility.
 
 
 24
 This error does not require a reversal, however, as Local 912 did not violate its duty of fair representation by failing to pursue a grievance against R-P on behalf of plaintiffs. A union breaches its duty of fair representation when it engages in "arbitrary conduct." Vaca v. Sipes, 386 U.S. 171, 177 (1967). A union's actions are arbitrary "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991)(citations omitted); see also Adcox, 21 F.3d at 1387. Local 912's decision to not pursue a grievance against R-P was not arbitrary conduct, as it knew that any grievance would be futile; aside from being able to supply the necessary forms for filing a request for employment with ICIA (which it did), R-P's "hands were tied." As Local 912 did not breach its duty of fair representation,[3] plaintiffs' hybrid Sec. 301 claim against both R-P and Local 912 fails.[4]
 
 
 25
 C) Plaintiffs' Sec. 301 Claim against ICIA.
 
 
 26
 In an effort to prove that ICIA breached its obligations to them, plaintiffs contend that their right to make a one-time transfer to the organic plant is a "vested" right that cannot be modified or abandoned by a later CBA.[5] This circuit recognizes "two basic ways" in which plaintiffs may prove that a right is vested. Cincinnati Typographical Union No. 3, Local 14519 v. Gannett Satellite Info. Network, Inc., 17 F.3d 906, 910 (6th Cir. 1994). First, parties may be found to have intended a right to vest if the contract language or extrinsic evidence supports such a conclusion. Id. (citations omitted). Second, a court will treat certain rights which the employee works to accumulate over time as vested, even without any evidence of such intent in the contract. The typical examples of this type are severance pay and vacation pay. Id. at 911. We find that this case implicates neither.
 
 
 27
 First, neither the language of the cross-bumping agreement[6] nor extrinsic evidence indicates that the employees' right to transfer was intended to be vested. Rather, the 1982, 1985 and 1988 CBAs stated explicitly that the cross-bumping agreement was "supplemental to the Collective Bargaining Agreement between the parties ... and shall remain in full force and effect during the period of such Collective Bargaining Agreement unless modified by the parties in writing."
 
 
 28
 Second, plaintiffs offer this court no support for treating their right to transfer as the second type of vested right. While plaintiffs cite a number of cases, all are distinguishable from the present situation. In both Cincinnati Newspaper Guild v. Cincinnati Enquirer, Inc., 863 F.2d 439, 440 (6th Cir. 1988), and Heheman v. E. W. Scripps Co., 661 F.2d 1115, 1121 (6th Cir. 1981), cert. denied, 456 U.S. 991 (1982), the contracts at issue contained either an automatic renewal term or a term indicating that the agreement was permanent until modification by both parties. Neither the CBAs nor the cross-bumping agreement of the present case contained such a term. Further, the cases involving pension and retiree benefits are unpersuasive, as the Supreme Court has explicitly held those rights to be vested. See, e.g., United Mine Workers of America Health & Retirement Funds v. Robinson, 455 U.S. 562, 575 n.14 (1982)(pension benefits); Weimer v. Kurz-Kasch, Inc., 773 F.2d 669, 672-73 (6th Cir. 1985)(retiree benefits). The dismissal of the Sec. 301 claim against ICIA was therefore proper.
 
 
 29
 D) The Validity of the Employee Releases.
 
 
 30
 In exchange for releasing the company from most of its obligations to them, a number of the plaintiffs accepted severance pay from R-P in amounts depending, in part, on the length of their employment. The release explicitly stated:
 
 
 31
 I hereby release the Company from any and all pending and future obligations and liabilities to me arising out of employment with the Company, except for any unemployment compensation or worker's compensation claims that I may make and except as provided under the terms of the Memorandum of Understanding.
 
 
 32
 (emphasis added). Based on this release, the district court dismissed all the claims against R-P made by those plaintiffs who signed a release. Plaintiffs challenge this decision, contending that the release is: (1) unconscionable and a product of overreaching by R-P; (2) void for want of consideration since no additional amount was paid to employees with potential transfer rights; and (3) ambiguous, thereby requiring a jury determination.
 
 
 33
 We disagree. Plaintiffs offer this court no basis for finding unconscionability or overreaching. Further, the plaintiffs received severance pay in consideration of their release. In fact, the amount paid to the employee depended, in part, upon the length of their employment (i.e., seniority with the company), thereby implicitly taking into account plaintiffs' potential transfer rights. Finally, the language of the release is clear and unambiguous; it specifically informed the plaintiffs that they were waiving any and all claims against R-P except for workers compensation or unemployment compensation claims.
 
 
 34
 E) Breach of the IUOE Constitution.
 
 
 35
 Plaintiffs contend that Local 912 and IUOE, as one union, violated Article VI(2), (3), and (5) and Article XXIV(11)(e) of the IUOE Constitution. While we agree that plaintiffs, as third-party beneficiaries of the IUOE Constitution, may sue to enforce the provisions of that constitution, see Wooddell v. International Bhd. of Elec. Workers, 502 U.S. 93, 98-99 (1991), Local 912 and IUOE are separate entities and should be treated as such.[7] For this reason, we will consider the claims against each union separately.
 
 
 36
 1) Local 912.
 
 
 37
 Article XXIV(11)(e) of the Union Constitution provides:
 
 
 38
 Proposed collective bargaining agreements and modifications thereof may be negotiated for Local Unions by the Business Manager, by a committee, by the Local Executive Board, or by the Business Representative. Such agreements and modifications thereof shall not be executed until they have been presented at the next membership meeting following the negotiation of the proposed agreement and have been approved by the membership affected, provided, however, that a Local Union may delegate to its Local Executive Board or to its bargaining committee authority to approve such agreements and modifications without such submission of the same to vote of its membership.
 
 
 39
 Plaintiffs contends that Local 912 violated this provision by failing to submit the 1991 organic plant CBA to a vote by the entire membership prior to accepting the contract.
 
 
 40
 We disagree. The membership of each unit elected its own negotiating committee, each having the authority pursuant to Article XXIV(11)(e) to approve agreements and modifications for their particular plant without submission to a vote of the entire membership. Hence, just as the R-P bargaining committee alone voted on CBA agreements for R-P, the ICIA bargaining committee had the authority to separately vote on the 1991 CBA with ICIA. Local 912 did not violate the IUOE Constitution.
 
 
 41
 2) IUOE.
 
 
 42
 Plaintiffs contend that IUOE breached Article VI(2), which provides that the General President "shall ... be empowered to interpret the provisions of the Constitution and decide questions of law arising thereunder," when General President Hanley, in response to Kincade's letter requesting advice regarding Article XXIV(11)(e), stated that Article XXIV(11)(e) only applied to proposed modifications of a CBA. Plaintiffs characterize this response as inappropriate and nonsensical.
 
 
 43
 Given that we "must defer to a union's interpretation of its own constitution so long as the interpretation is not unreasonable," Maher v. International Bhd. of Elec. Workers, 15 F.3d 711, 714 (7th Cir. 1994) (citations omitted), we find that plaintiffs have not established that IUOE breached Article VI section 2. While Hanley's response was non-responsive to the question asked, it was not incorrect and, therefore, not unreasonable. Further, Hanley cannot be said to have breached the constitution, as nothing in section 2 obligated Hanley to interpret the constitution on demand. Rather, as Article VI(5) explicitly states, the General President "shall be vested with unlimited discretion in the application and administration of his powers and duties."
 
 
 44
 Next, plaintiffs claim that IUOE violated Article VI(3), which gives the General President the authority to provide "international supervision" in the form of a trusteeship in the event of a local's misconduct, when Hanley declined to intervene in the dispute between plaintiffs and Local 912. The district court determined that plaintiffs waived this claim during plaintiffs' argument on this issue, and we agree.[8] Further, even if the argument was properly before this court, it would fail, as Hanley's response was not unreasonable.
 
 
 45
 Finally, plaintiffs claim that the IUOE breached its duty of fair representation as embodied in Article VI(5) of the IUOE constitution. Contrary to plaintiffs' position, however, a union's duty of fair representation does not arise from the provisions of a union's constitution, but from the unions' exclusive authority under the NLRA to represent all employees in a bargaining unit. Chauffeurs, Teamsters & Helpers Local No. 391 v. Terry, 494 U.S. 558, 563 (1990). Local 912, not IUOE, is the exclusive bargaining representative of plaintiffs and, therefore, Local 912 alone owes plaintiffs a duty of fair representation.
 
 
 46
 F) Exclusion of the Internal Memorandum from Evidence.
 
 
 47
 Plaintiffs challenge the district court's exclusion from evidence of an internal memorandum which was written by an employee of R-P and authenticated by stipulation of the parties. While we review evidentiary rulings for an abuse of discretion, reversal is appropriate only when we find that such abuse of discretion "has caused more than harmless error." Cooley v. Carmike Cinemas, Inc., 25 F.3d 1325, 1330 (6th Cir. 1994)(citations omitted).
 
 
 48
 The district court did not abuse its discretion in excluding the evidence in question. Plaintiffs attempted to introduce the document through a witness with no personal knowledge of the documents or the contents contained therein. This clearly violates Fed. R. Evid. 602's mandate that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Second, any error was harmless. Plaintiffs intended to use the memorandum to show what R-P knew of its obligations under the cross-bumping agreement, information that would be relevant only to plaintiffs' conspiracy or hybrid Sec. 301 claim. Given the problems inherent with both claims, we find that this evidence, even if admitted, would not have warranted a different result.
 
 
 49
 AFFIRMED.
 
 
 50
 CONTIE, J., Circuit Judge, concurring.
 
 
 51
 I concur. In regard to issue IIB, I feel it is necessary to point out that the union was responsible for strongly encouraging the adoption of the cross-bumping agreement by R-P even though as the majority states, it knew that R-P's "hands would be tied" in an effort to enforce the agreement. The union then refused to pursue a grievance in order to enforce the agreement because it knew such an effort would be futile. I believe R-P and the union shared responsibility for the adoption of an unenforceable agreement in the event of separate ownership of the two plants and in these circumstances, R-P had a valid defense of impossibility. Therefore, I do not believe the district court was in error and would affirm on this basis.
 
 
 
 [1]
 Defendant Stauffer was dismissed without objection and is not a party to this appeal
 
 
 [2]
 Upon reviewing the contracts at issue, we question whether R-P had any duty under the 1988 CBA or cross-bumping agreement to assist in plaintiffs' transfers to the ICIA plant. For purposes of argument, however, we will treat R-P as having such a duty
 
 
 [3]
 While plaintiffs also pursued a separate fair representation claim against Local 912 based upon Local 912's conduct of negotiating the deletion of the cross-bumping agreement from the 1991 organic plant CBA without including plaintiffs in the vote, plaintiffs failed to raise this claim in their appellate brief. Instead, plaintiffs attempted to indirectly argue the issue in their reply brief. Given that "[i]ssues raised for the first time in a reply brief are not properly before this court," United States v. Perkins, 994 F.2d 1184, 1191 (6th Cir.) (citations omitted), cert. denied, 114 S.Ct. 279 (1993), we decline to consider the merits of this claim
 
 
 [4]
 Given our resolution of the hybrid Sec. 301 claim, we find it unnecessary to determine the effect of the 1988 memorandum which R-P incorporated in both the 1988 and 1991 CBAs
 
 
 [5]
 Plaintiffs also contend that Local 912's 1991 CBA with ICIA is invalid. Any such argument is not properly before this court, however, as this court lacks the jurisdiction under Sec. 301 to decide the validity of CBAs. Adcox, 21 F.3d at 1386
 
 
 [6]
 The cross-bumping agreement provided:
 Local Union No. 912, International Union of Operating Engineers and Stauffer Chemical Company for its Phosphorus Products Plant (Furnace) and its Intermediate Agricultural Chemicals Plant (Organic), both located in Mt. Pleasant, Tennessee do hereby agree that:
 
 
 [1]
 Employees hired prior to September 11, 1982 may exercise layoff rights as described below with the exception of current furnace plant employees who do not have the seniority to displace current employees at the organic plant
 
 
 [2]
 Employees shall first exhaust their rights under the layoff procedures described in the [CBA] covering the plant to which they are assigned
 
 
 [3]
 Employees of either plant covered by this Memorandum of Agreement who are to be laid off from their plant may then displace junior employees in the other plant provided that:
 a. The employee displaced shall be the junior employee in the classification.
 b. The employee must qualify for such classification after a reasonable training period of fifteen (15) working days or less at the furnace plant. If the employee fails to qualify, he will not be allowed to make further choices of jobs but rather will be laid off.
 
 
 [4]
 Employees who elect to move from one plant to another will become an employee of the plant to which they have moved and will have no further rights to return to the other plant
 
 
 [5]
 Employees who are given the opportunity to exercise their right under this Memorandum of Agreement and who decline to do so shall forfeit future rights under this Agreement
 
 
 [7]
 "[W]ithout evidence that [IUOE] instigated, supported, ratified or encouraged the Local's activities or that the Local acted pursuant to its agreement with the International, there [is] no agency relationship as a matter of law." Moore v. Local Union 569 of Int'l Bhd. of Elec. Workers, 989 F.2d 1534, 1543 (9th Cir. 1993), cert. denied, 114 S. Ct. 1066 (1994). While plaintiffs use the words "full participant" and "authorized," they offer this court no proof of such, and, therefore, have failed to establish an agency relationship. See Shimman v. Frank, 625 F.2d 80 (6th Cir. 1980)
 
 
 [8]
 Plaintiffs also contend that IUOE violated Article VI, section (5). Plaintiffs completely failed to pursue this claim below, however, and we consider it waived