**The CINCINNATI NEWSPAPER GUILD, LOCAL 9, The Newspaper Guild, Plaintiff–Appellant,**

v.

**The CINCINNATI ENQUIRER, INC., Defendant–Appellee.**

No. 86–4092.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 22, 1987.

Decided Dec. 13, 1988.

Rehearing Denied Jan. 11, 1989.

James B. Robinson (argued), Kircher and Phalen, Cincinnati, Ohio, for plaintiff-appellant.

Jerome C. Randolph (argued), Michael T. Alexander, Cincinnati, Ohio, for defendant-appellee.

Before GUY, NELSON and BOGGS, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

The Cincinnati Newspaper Guild brought an action under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), to require The Cincinnati Enquirer to arbitrate a grievance under a collective bargaining agreement. The agreement in question had been entered into by the Enquirer and a labor organization (The Enquirer Editorial Employees Professional Association, or "EEEPA") to which the Guild claimed to be the successor.

The district court, in a decision reported at 650 F.Supp. 26 (S.D.Ohio 1986), entered summary judgment for the Enquirer and denied a motion filed by the Guild to compel arbitration. In its decision, which is now before us on appeal, the district court found (1) that the collective bargaining agreement had expired before the Guild achieved recognition as the representative of the employees originally represented by EEEPA, and (2) that the Guild was not EEEPA's successor as a contracting party.

Both findings, we believe, are incorrect as a matter of law. As shown by the express language of the collective bargaining agreement and by the practical construction the parties placed on it, the provisions of the agreement remained in effect at all times pertinent to this litigation. The Guild stepped into EEEPA's shoes as a party to the agreement, in our view, and thereby acquired standing to enforce the contractual provisions relating to resolution of disputes. We shall therefore reverse the judgment of the district court and direct that an order be entered compelling arbitration in accordance with the terms of the agreement.

I

On June 2, 1981, EEEPA and the Enquirer entered into an agreement covering the wages, hours, and other conditions of employment of all of the Enquirer's Editorial Division employees for whom EEEPA was the recognized bargaining agent. The opening paragraph recited that the agreement was to become effective "commencing the first day of March of 1981 and continuing as hereinafter provided...."

What was "hereinafter provided" with respect to continuation of the agreement was this:

"This Contract shall be in effect through February 29, 1984, and shall renew itself automatically each year thereafter; provided, however, that at least ninety (90) days and not more than one hundred twenty (120) days prior to expiration or time of renewal, either party may give written notice of desire to change the terms of this Contract. In such event negotiations shall be entered into and shall proceed with all due diligence. Status quo conditions shall be maintained during the period of negotiations and until a new Contract shall have been executed." Contract Article XXI.

No notice of desire to change the contract terms is contained in the record of this case, but there is indirect evidence that such a notice was given by EEEPA on November 11, 1983, a date that was between 90 days and 120 days prior to expiration/renewal. Pursuant to the notice of desire, contract negotiations between EEEPA and the Enquirer were held on December 15 and December 16, 1983.

On December 21, 1983, the president of the Cincinnati Newspaper Guild sent the president of the Enquirer a letter reading as follows:

"At a meeting of the members of the Enquirer Editorial Employees Professional Association held Saturday, December 17, 1983, upon due notice and in accordance with the constitution and bylaws of the Enquirer Editorial Employees Professional Association, the membership voted 56 to 3 by secret ballot to affiliate and become a unit of the Cincinnati Newspaper Guild, a local of The Newspaper Guild, AFL–CIO, CLC. A copy of the resolution is attached.

By virtue of this action, the Cincinnati Newspaper Guild has become the successor to the Enquirer Editorial Employees Professional Association, both as exclusive bargaining representative of the employees in the applicable bargaining unit

and as party to the current collective bargaining agreement.

Attached is the notice sent to you under the date of November 11, 1983, concerning the opening of negotiations. This same notice is to be deemed our notice as of the date of the resolution referred to above.

Kindly acknowledge by return letter immediately your agreement to recognize the Cincinnati Newspaper Guild as the successor party."

On December 23, 1983, the Enquirer's president responded thus:

"In reply to your letter of December 21, I do not believe that the Guild represents a majority of our editorial employees. Therefore, we do not recognize the Guild as the bargaining representative or as a 'successor party.' Among the many reasons for my position is the fact that 56 is, obviously, not a majority of our editorial department."

The Guild promptly filed a representation petition with the National Labor Relations Board.

A representation election held at the end of 1984 resulted in certification of the Guild as the collective bargaining representative of the Editorial Division employees formerly represented by EEEPA. The Guild and the Enquirer thereafter made periodic efforts to negotiate a new contract, but those efforts had not been crowned with success by the time this lawsuit was submitted to the district court for decision.

During the course of its negotiations with the Guild over a new contract, the Enquirer repeatedly manifested an understanding that the obligations imposed by the old contract remained in effect. Thus, in July of 1985, the editor of the Enquirer wrote a letter to the Guild acknowledging that "[o]n the matter of posting positions, *it is our contractual obligation* to post all positions covered by the Guild." (Emphasis supplied.) In October of 1985, the man in charge of the Enquirer's copyclerks sent them a memorandum complaining about their making their own hours. "For some reason," the memorandum stated with evident disapproval, "my copyclerks don't think they are covered by the contract." The memorandum then presented a detailed analysis of §§ 4.02, 4.03 and 5.04 in Articles IV and V of the contract, and concluded with the following observations:

"I have tried to be fair and understanding of everyone's needs, but if you are abusing the rules and not being fair with me, then I will have to demand strict compliance with the contract.

As of now, we will all adhere to the contract language."

In January of 1986 another management official issued a memorandum stating, among other things, "I am bound by the contract to grant employees preference according to seniority...."

The record contains no indication that the Guild ever demurred to any of these statements by management about the binding effect of the contract. On the contrary, an affidavit executed in May of 1986 by the president of the Guild's Enquirer unit says that while the parties continued their negotiations over a new contract, "the Guild and the Enquirer have continued operating under the old contract." The affidavit goes on to say that "[w]e handle grievances under the procedures specified in that contract, and both parties acknowledge the contract language as controlling on the merits."

An affidavit executed by the Enquirer's personnel manager avers simply—without reference to the automatic renewal provision in Article XXI—that "[a]fter February 29, 1984, the collective bargaining agreement between EEEPA and the Enquirer expired." This affidavit (the only one filed by the Enquirer) does not address the question of renewal, does not deny that the editor and other management officials said what they said in 1985 and early 1986 about the binding effect of the contract, and does not deny that grievances were handled under the procedures specified in the contract. In its brief on appeal, moreover, the Enquirer does not take issue with the district court's finding that since March 1, 1984, "the Enquirer, at least to some extent, has operated in accordance with

[the contract's] terms." 650 F.Supp. at 28. What the Enquirer does argue is this:

"Maintenance of status quo conditions by following the substantive provisions of the expired labor agreement until a new agreement is reached or impasse occurs is a legal requirement imposed by § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5). The Enquirer's compliance with § 8(a)(5) cannot lead to the conclusion that the labor agreement was extended." (Citations omitted.)

The particular chain of events that culminated in the filing of this lawsuit began on December 26, 1985, when, in what the Guild seems to have considered a rather unusual observance of Boxing Day, the Enquirer gave no fewer than three written disciplinary warnings to an Editorial Division employee named Gerry Wolter. The Guild then sent management a letter that began as follows:

"This is a grievance in response to your three warnings to Gerry Wolter. Your decision to issue all three to him in one day is unprecedented. It is an action that fails to match the letter, spirit or history of the contractual relationship between management and editorial employees at the Cincinnati Enquirer.

Given that, it is impossible not to question your intent. In the first instance, Wolter was clearly asserting his legal right in asking for his overtime payment. It is illegal to discriminate against an employee for exercising his or her rights in such work matters, particularly where there is a contractual relationship between management and employees."

After further commentary along these lines, the Guild's grievance letter made this request:

"In short, Jim, while we may discuss the differences that remain, the use of three warnings in one day clearly indicates a pattern of discrimination against Wolter—an effort to 'get' him for exercise of his legal rights.

If this is not your intent, why not put aside the first two warnings and re-instate Wolter with pay? Then we can discuss the remaining issues without confusion."

The Guild's request was not granted, and on January 31, 1986, Wolter was fired. The Guild thereupon presented another grievance and requested a hearing before the editor. If such a hearing was held, the result apparently was not satisfactory to the Guild; on March 3, 1986, the Guild sent a letter to the editor requesting that the firing of Gerry Wolter be arbitrated "[i]n accordance with sections 13.01 and 13.02 of the last contract...." The editor replied that "[t]he Guild has no right of arbitration with the Enquirer." The Guild then proposed "that we arbitrate the arbitrability·of our grievances." The Enquirer said it was "not interested." This lawsuit followed, with the results already described.

II

Neither the district court's opinion nor the Enquirer's brief explains why the collective bargaining agreement should be thought to have expired without renewal on March 1, 1984. Article XXI of the agreement, as we read it, automatically extended the contract.

That article, which is captioned "TERM OF CONTRACT," says, as we noted earlier, that the contract "shall renew itself automatically" each year after the conclusion of the initial term. This statement is followed by a proviso saying that during a prescribed period of time "either party may give written notice of desire to change the terms of this Contract."

In and of itself, the giving of a "notice of desire" obviously cannot change the terms of the contract. The experience of mankind from time immemorial has been that notice of desire is not inevitably tantamount to consummation of desire.

What, then, is the effect of a notice of desire in this case? Although the parties might have been well advised to say that the giving of a timely notice of desire would prevent the contract from automatically renewing itself, it happens that they said no such thing. If either side would have preferred that the contract so provide, the preference did not find voice in Article

XXI. All that the parties actually said, after specifying (a) that the contract would automatically renew itself and (b) that before it did so either party could give notice of a desire for change, was this:

"In such event negotiations shall be entered into and shall proceed with all due diligence. *Status quo conditions shall be maintained during the period of negotiations and until a new Contract shall have been executed.*" (Emphasis supplied.)

The conditions to be maintained *in statu quo*, we should have thought, could only be the conditions agreed to in the contract.

The management of the Enquirer evidently thought so too. When the newspaper's editor told the Guild, in July of 1985, that it was the Enquirer's "contractual" obligation to post all positions, he did not say that this was the Enquirer's obligation under § 8(a)(5). The word he used was "contractual." Words are an editor's stock in trade, and when the editor of a major metropolitan newspaper uses the word "contractual," it is not lightly to be supposed that what he means is "non-contractual."

The practical construction placed upon a contract by people who have agreed to be bound by its terms is universally held to be relevant in determining, should the matter be in doubt, what those terms were supposed to mean. See *Tennessee Consolidated Coal Co. v. United Mine Workers of America*, 416 F.2d 1192, 1198 (6th Cir. 1969), and the cases there cited. In the case at bar the Enquirer and the Guild showed by their conduct that they understood the contract to mean precisely what it appears to say; that is, that the contract would automatically renew itself, after the giving of timely written notice of desire, for a period ending at such point as a new contract should have been executed.[1] The Enquirer may not repudiate this understanding now, any more than the Guild could repudiate the no-strike provision of the contract, for example, if the shoe were on the other foot.

The fact that the provision sought to be enforced in this case is an arbitration provision puts the Guild in a particularly advantageous position, it seems to us, given the fact that the contract was drafted "against a backdrop of well-established federal labor policy favoring arbitration as the means of resolving disputes," and given the fact that the Supreme Court "has established a strong presumption favoring arbitrability...." *Nolde Brothers, Inc. v. Local No. 358*, 430 U.S. 243, 254, 97 S.Ct. 1067, 1073, 51 L.Ed.2d 300 (1977). Even an oral agreement to continue operating under the provisions of labor contracts that have, by their terms, expired is enough to justify entry of an order compelling arbitration under provisions that have thus been revivified pending agreement on a new contract. *Inner City Broadcasting Corp. v. American Federation of Television and Radio Artists*, 586 F.Supp. 556 (S.D.N.Y. 1984).

The question of whether the arbitration provisions of the Enquirer's contract had expired without renewal is, as the district court implicitly recognized, a question of law that may properly be resolved in summary judgment proceedings. The relevant facts are not in dispute—and even if there were room for good faith disagreement as to the inferences to be drawn from those facts, this would "not demonstrate a genuine issue of material evidentiary fact, but instead illuminate the ultimate legal issues to be resolved." *Chauffeurs, Teamsters and Helpers v. C.R.S.T., Inc.*, 780 F.2d 379, 381 (8th Cir.1985).

The holding of *Chattanooga Mailers Union v. Chattanooga News–Free Press Co.*, 524 F.2d 1305 (6th Cir.1975) is not to the contrary, although the opinion in that case does quote *S.J. Groves & Sons Co. v.*

---

1. If, notwithstanding diligent good faith negotiations, it became apparent that no new contract could be agreed upon, perhaps federal labor law would treat the old contract as terminating when the parties had bargained to the point of impasse. The Enquirer did not contend that such a point was ever reached here, so we need not address that issue. See *Nashville Newspaper Printing Pressmen's Union Local 50 v. Newspaper Printing Corporation*, 518 F.2d 351, 352 (6th Cir.1975).

*Ohio Turnpike Commission,* 315 F.2d 235, 237–38 (6th Cir.), *cert. denied,* 375 U.S. 824, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963), to the effect that summary judgment is not appropriate where the parties in good faith disagree about the inferences to be drawn from basic facts that are not in dispute. Rule 56(e) of the Federal Rules of Civil Procedure was amended in 1963 to provide that one opposing the entry of summary judgment must set forth "specific facts" (as opposed to mere inferences) showing that there is a genuine issue for trial. If we were to let the hostility to summary judgment reflected in *S.J. Groves* control our decision here, we should not only be playing fast and loose with the amended language of Rule 56, but with the clear instructions the Supreme Court has given us in such recent decisions as *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *Matsushita Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Guild's motion to compel arbitration was a motion for summary judgment, in effect, as the Enquirer recognized when it styled its own subsequent motion a "cross-motion" for summary judgment. If the Guild had standing to enforce the provisions of the collective bargaining agreement as EEEPA's successor (a question to which we shall turn shortly), and if those contractual provisions remained effective as a matter of law, the Guild was obviously entitled to prevail on its motion.

Nothing in *Kingsport Publishing Corp. v. NLRB,* 399 F.2d 660 (6th Cir.1968), authorizes us to hold that the Guild is not entitled to arbitration. *Kingsport* was a case in which a union notified a publishing company, pursuant to the terms of a collective bargaining agreement, that "on October 31 any agreement—written, oral or implied—or any conditions of employment or other understanding now in effect between the [Company] and [the Union] will terminate." *Id.* After the collective bargaining agreement had expired, the union and the NLRB took the position that § 8(a)(5) of the Labor Management Relations Act obligated the publishing company to process grievances "in accordance with the procedure contained in the contract which terminated in October...." *Id.* at 661. This court disagreed. Citing *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), and *Amalgamated Clothing Workers v. Ironall Factories Co., Inc.,* 386 F.2d 586 (6th Cir.1967), for the familiar proposition that arbitration rests upon a contractual basis, 399 F.2d at 661, and noting that "neither party to the contract could successfully have brought suit under Section 301 of the Labor Management Relations Act to compel arbitration," *id.* at 662, we concluded that there had been no showing that the grievance procedure prescribed by the expired contract had become such a part of the "established operational pattern" at the plant as to be enforceable under § 8(a)(5). *Id.*

In the case at bar, of course, the Guild is relying not on § 8(a)(5) but on the contract itself. If the letter sent to the Enquirer on November 11, 1983, had purported to terminate the contract, as the letter sent by the union in *Kingsport* did, we presume that the Enquirer's able lawyers would have favored the district court with a copy. They did not.

It would be surprising if the November 11 notice of desire to change the contract had said that the contract would not be renewed pending execution of a new contract; nothing in Article XXI authorized either party to cancel the automatic renewal provision. If that provision meant what it said—and the conduct of the parties strongly suggests that it did—the contract renewed itself automatically. And the reason the Enquirer continued to handle grievances in accordance with the contractual procedures and continued to tell the employees that both sides were bound by the contract was not, as the Enquirer now contends, that § 8(a)(5) precludes a change in working conditions while the parties are in negotiation after the expiration of a labor agreement; the reason, rather, was that the contract had been renewed and was in full force and effect.

The terms of the contract having been continued in effect by operation of the contract itself, as the parties to this lawsuit obviously understood and as we now hold, it remains to us only to decide whether the Guild has standing to enforce the contract as EEEPA's successor. For the reasons that follow, we think the Guild may enforce the contract even though it did not sign it.

### III

■ When EEEPA negotiated and signed the collective bargaining agreement with the Enquirer, EEEPA was acting not as a principal, but as the agent of the employees in the bargaining unit. See § 9(a) of the Labor Management Relations Act, 29 U.S.C. § 159(a). It is established law that the employees could change their bargaining agent if they wished to do so. *Modine Manufacturing Co. v. IAM*, 216 F.2d 326, 329 (6th Cir.1954).

On December 17, 1983, according to the letter which the Guild sent the Enquirer soon thereafter, the membership of EEEPA voted to have the Guild become their bargaining agent. Had it been clear at that time that a majority of all employees in the *bargaining unit* had made the Guild the bargaining agent, we take it that there could have been no question (assuming a willingness on the Guild's part to accept the provisions of the existing contract) that the contract would have had to be administered by the Guild. See *Modine*, 216 F.2d at 329 ("Since it is established that the bargaining agent can be dispensed with or changed by the employees, it is evident that the contract of 1948 after the election of 1950 had to be administered by the [successor bargaining agent]"). The Enquirer could not have resisted the substitution of the Guild as administrator of the contract on the ground that the Enquirer would thereby be saddled with substantive contract provisions that it had neither agreed to nor assumed, see *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 284, 92 S.Ct. 1571, 1580, 32 L.Ed.2d 61 (1972), because the Enquirer had in fact agreed to all of the provisions of the contract, including the arbitration provisions, when its labor relations director put his signature to the document on the Enquirer's behalf.

The reasons cited by the Enquirer for not recognizing the Guild as a successor party in 1983 were that a majority of the employees in the bargaining unit had not voted for the Guild to become their bargaining agent, and the Enquirer did not believe that the Guild in fact represented a majority of the bargaining unit employees. The Guild overcame that hurdle in the representation election conducted in 1984, however, and the Enquirer thereafter did recognize the Guild as the representative of the employees in the bargaining unit.

The arbitration provisions of the contract were still in effect, as we have seen, when the Guild finally achieved recognition. Whether or not the Guild could have repudiated the contract at that point, notwithstanding its earlier election to adhere to it as a successor party, the Guild never did repudiate the contract. On the contrary, according to the uncontested averment of the president of its Enquirer unit, the Guild continued operating under the old contract and handled grievances under the procedures specified in the contract.

It is true that the entity with which the Enquirer had signed the contract was EEEPA, and the instrument did not say that the agreement would be binding on the parties' "successors and assigns." If this had not been a labor contract, perhaps the Enquirer could have argued that the contract was personal to EEEPA and was not assumable, over the Enquirer's objection, by anyone else. But a collective bargaining agreement "is not an ordinary contract." *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 550, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964). Under the federal law applicable to collective bargaining agreements, the representative of the employees is chosen by the employees and may from time to time be changed by the employees whether the employer happens to approve of the choice or not. And under that federal law, the right of the employees to have their grievances arbitrated in accordance with procedures hammered out between

the employer and a properly recognized bargaining agent may not be abrogated by the employer merely because the employees subsequently see fit to change their agent.

Judge Leroy Contie, now a senior judge of this court, once summarized the holding in *John Wiley & Sons* as a holding "that a successor employer, who neither explicitly nor implicitly assumes the collective bargaining agreement of its predecessor, can, under certain circumstances, be bound to arbitrate with the union under said agreement." *General Truck Drivers and Helpers v. Strabley Building Supply, Inc.*, 84 Lab. Cas. (CCH) ¶ 10,694 (U.S.D.Ct., N.D. Ohio 1978) [1978 WL 1635]. Judge Contie went on to say that "[i]f, in certain situations, a successor employer can be held to portions of a collective bargaining agreement it neither specifically nor implicitly assumed, it would be incongruous to hold that the whole of a collective bargaining agreement cannot be enforced against a successor employer that has, by its actions, assumed said agreement, in the absence of a writing evidencing said assumption." *Id.*

It would be no less "incongruous" here, in our opinion, to hold that a recognized bargaining agent which has expressly declared, in writing, that it considers itself a successor party to a currently existing collective bargaining agreement, and which has by its actions assumed that agreement after an automatic renewal, may not invoke the agreement's arbitration provisions on behalf of an aggrieved member of the unit represented by the bargaining agent. The district court's finding that the Guild is not EEEEPA's successor for that purpose is clearly erroneous.

The judgment of the district court is REVERSED, and the case is REMANDED for entry of an appropriate order compelling arbitration.

## ON PETITION FOR REHEARING

PER CURIAM.

The Enquirer has petitioned for rehearing on the ground, *inter al.*, that our construction of Article XXI of the collective bargaining agreement conflicts with the construction given a similar provision in *Oakland Press Co. v. NLRB*, 606 F.2d 689 (6th Cir.1979). We see no conflict.

The *Oakland Press* provision said that the agreement would "continue in full force and effect from year to year ... *unless* written notice of desire to cancel or to terminate is served by either party...." (Emphasis supplied.) The dictionary definition of "unless" is "under any other circumstance than that," or "except on the condition that," or "if ... not." Webster's New International Dictionary, 3rd Ed. What the *Oakland Press* agreement said, therefore, was "this agreement shall continue in full force and effect from year to year ... if written notice of desire to cancel or to terminate is not served by either party...." The stated condition would not be met, obviously, if a notice of desire to cancel or to terminate were served by either party, and in light of the parties' past practice we held that the condition would not be met if a party served notice of a desire to negotiate changes.

In the case at bar, by contrast, the agreement does not use the word "unless." What this agreement says, rather, is that the agreement "shall renew itself automatically ... provided, however, that ... either party may give written notice of desire to change the terms...." It is conceivable, to be sure, that a careless draftsman might have used a "provided, however," construction when he intended to impose a condition in the way that the word "unless" did in *Oakland Press*. As explained in our original opinion, however, the practical construction that the Enquirer and the Union seem to have placed on the agreement in this case rules out any possibility that Article XXI was intended to mean something other than what it actually says.

The petition for rehearing is overruled.