**Edward John AUGER, III**
**Plaintiff–Appellant,**

v.

**ABB FLEXIBLE AUTOMATION, INC., Defendant–Appellee.**

No. 00–1585.

United States Court of Appeals, Sixth Circuit.

March 29, 2002.

Nelson, Circuit Judge, dissented and filed opinion.

Before JONES, NELSON, and DAUGHTREY, Circuit Judges.

JONES, Circuit Judge.

Plaintiff Edward J. Auger, III ("Auger") brought this negligence action against defendant ABB Flexible Automation, Inc. ("ABB") for damages incurred while Auger was a temporary worker at ABB's job site. ABB moved for summary judgment based on the argument that it was a "co-employer" of Auger and therefore the exclusive remedy provision of the Michigan Worker's Disability Compensation Act ("the Act") barred plaintiff's negligence action. The district court granted summary judgment to the defendant. On appeal, Auger argues that the district court erred because (1) ABB was not his "co-employer" but rather had only "retained control" of his employment and (2) the facts create at least conflicting inferences as to his employment status which should be decided by a trier of fact. For the reasons stated below, we reverse and remand the case for a jury trial.

## I. BACKGROUND

In March 1998, Auger, a Michigan resident, began working as a pipe fitter at MTE Controls, LLC ("MTE"). MTE specializes in the installation of pneumatic, hydraulic and electrical control systems. ABB, a New York corporation, designs and manufactures product assembly lines.[1] ABB contracted with General Motors Corporation to design and manufacture an engine block line, and, in the spring of 1998, ABB was in the process of assembling the line at its plant in Warren, Michigan.

ABB contracted with various companies for trained workers to assemble the line. ABB contacted MTE to obtain additional manpower to complete the General Motors project. ABB indicated that it needed MTE pipe fitters to complete the conveyor line project. MTE submitted hourly rate quotations for its various categories of pipe fitters. From March 10, 1998 through June 26, 1998, MTE workers assisted ABB with the conveyor line project. MTE billed ABB on a weekly basis for the pipe fitters used by ABB. Auger was one of the MTE pipe fitters on the GMC/ABB project.

On May 22, 1998, Auger was tagging pneumatic lines near a conveyor belt.

---

**1.** Although ABB is a New York corporation, it has its principal place of business in New Berlin, Wisconsin and is duly qualified to conduct business in the State of Michigan. Thus, we have jurisdiction over the subject matter of this action as it is a controversy between different citizens of different states and the jurisdictional amount in controversy exceeds the statutory minimum. 28 U.S.C. §§ 1291, 1332(a)(1) (2000).

While tagging the line, Auger leaned in towards the unguarded conveyor and was pulled into it. The accident mangled his right hand and arm, rendering both useless.

On December 17, 1998, Auger filed suit seeking to recover against ABB for negligence based in part on its "retained control" of the project. At the close of discovery, ABB filed a Motion for Summary Judgment, asserting that it was Auger's "joint employer" and thus shielded from liability by virtue of the exclusive remedy provision of the Act. In opposition, Auger cited the district court to several record references which he asserted could lead a jury to reasonably conclude that Auger was not an employee of ABB but rather was on the job exclusively as an employee of MTE.

The district court granted ABB's motion. The court applied the "economic reality test" for determining whether an employer/employee relationship exists and concluded that ABB was Auger's "joint employer." Thus, the court determined that the exclusive remedy provision of the Act barred plaintiff's negligence claim. The court also noted that whether MTE was a labor broker was immaterial to its analysis. On appeal, Auger argues that the district court's grant of summary judgment was erroneous because there are genuine issues of material fact as to whether he was an employee of ABB. Auger timely appealed to this court.

## II. DISCUSSION

### A. Summary judgment

The sole issue on appeal is whether multiple conflicting inferences regarding Auger's employment status precludes summary judgment. We review a grant of summary judgment *de novo*. *Terry Barr Sales Agency, Inc. v. All–Lock Co.*, 96 F.3d 174, 178 (6th Cir.1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. Civ. P. 56(c); *Terry Barr*, 96 F.3d at 178. No genuine issue for trial exists when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, this court must review the record, and any inferences derived therefrom, in the light most favorable to the non-moving party. *Id.* Accordingly, "when the non-moving party presents direct evidence refuting the moving party's motion for summary judgment, the court must accept the evidence as true." *Adams v. Metiva*, 31 F.3d 375; 382 (6th Cir.1994).

Whether a company is a particular worker's employer under the Act is a question of law for the courts to decide if the evidence "is reasonably susceptible of but a single inference." *Nichol v. Billot*, 406 Mich. 284, 279 N.W.2d 761, 767 (Mich. 1979). In a close case, however, where the factual issues cannot be easily resolved, the issue should be submitted to a trier of fact. *Clark v. United Tech.*, 459 Mich. 681, 594 N.W.2d 447, 454 (Mich.1999).

### B. Auger's employment status

The key question in this case is whether Auger was an employee of ABB. ABB argues that because a labor broker/customer relationship existed between itself and MTE, then ABB was a co-employer of Auger. Therefore, as a co-employer, ABB claims that Auger's recovery is limited by the exclusive remedy provision of the Act, Michigan Compiled Laws ("M.C.L.")

§ 418.131, and it is entitled to summary judgment as a matter of law. In opposition, Auger contends that no labor broker/customer relationship existed. rather ABB and MTE were in a general contractor/subcontractor or principal/agent relationship. Moreover, he argues that, under the "economic reality test," the totality of the facts and circumstances create at least conflicting inferences that he was not an employee of ABB. Therefore, he pleads a negligence liability theory based on the doctrine of retained control and asserts that the remedy issue should be submitted to a jury.

## 1. The Act

Section 418.131 of the Act provides that "the right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer." The Michigan courts have traditionally applied an "economic reality test" to determine the existence of an employer/employee relationship under the Act. *See e.g., Clark,* 594 N.W.2d at 451. However, as a condition precedent to applying this test, Michigan law requires a determination of whether a labor broker/customer relationship exists. *Kidder v. Miller–Davis,* 455 Mich. 25, 564 N.W.2d 872, 879–80 (Mich.1997). The district court did not address whether MTE was a labor broker or whether MTE and ABB were in a labor broker/customer relationship. Therefore, as determination of these questions is material to the outcome of this matter, we address the pre-condition first.

## 2. Labor broker/customer relationship

Auger denies that MTE was a labor broker and that he was assigned by MTE as a temporary worker in the typical labor broker/customer relationship. Rather, he argues that ABB was a general contractor and MTE acted as an outside contractor, brought into ABB's plant to provide specialty pipefitting work. As such, Auger asserts that the relationship between ABB and MTE was that of principal and agent rather than labor broker/customer.

Under Michigan law, it is well settled that in a situation involving a labor broker, the customer (or entity seeking temporary help) is considered a "co-employer" of the individual worker. *Farrell v. Dearborn Mfg. Co.,* 416 Mich. 267, 330 N.W.2d 397, 400 (Mich.1982). Generally, a labor broker employs contract workers and is in the sole business of supplying the workers as temporary labor to its customers. *See Kidder,* 564 N.W.2d at 877; *see also Renfroe v. Higgins Rack Coating & Mfg. Co.,* 17 Mich.App. 259, 169 N.W.2d 326, 328 (Mich.Ct.App.1969) (the worker arrives at the labor broker, signs a tax withholding form, and waits to be sent out as needed). The typical labor broker/customer relationship follows this scenario:

> The customers of a labor broker typically call in their employment needs on a daily basis, and workers are sent by the broker to fill these needs. After arriving at the place of business, the worker is subject to the control and authority of the customer and the customer's supervisory personnel. The customer has the power to discharge the employee from the daily work assignment and can refuse to accept a worker sent by the broker. The customer does not pay the employee directly. Rather, the labor broker pays the employee and includes as part of its charge to the customer amounts to cover its expenses for compensation premiums, social security, and other taxes.

*Farrell,* 330 N.W.2d at 400.

In contrast, a general contractor and subcontractor are in a principal/agent relationship. *Johnson v. Bechtel Assoc. Prof'l. Corp.,* 717 F.2d 574, 580 (D.C.Cir.

1983), *rev'd on other grounds*, 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984), *rehearing denied by* 468 U.S. 1226, 105 S.Ct. 26, 82 L.Ed.2d 919 (1984). An agent is one who is authorized by another (principal) to act on his behalf. An principal/agent relationship is characterized by the presence of two elements. First, there must be an indication by the principal that the agent will act on his behalf and subject to his control. Second, there must be a manifestation of consent by the agent so to act. RESTATEMENT (SECOND) OF AGENCY § 1(1958); *Rose v. Silver*, 394 A.2d 1368 (D.C.App.1978); *accord Lott v. Burning Tree Club, Inc.*, 516 F.Supp. 913, 917 (D.D.C.1980) (police are not agents of Country Club because not designated as such and Club exercised no *control* over the police). The extent of control and consent is evidenced both by the terms of the contract and by the actual dealings between the parties. In a general contractor/subcontractor relationship, the general contractor (the principal) agrees to allow the subcontractor (the agent) to act on its behalf. In order to effectuate this agreement, the general contractor and subcontractor must manifest their consent to act according to the proposed agreement. Here, there are both similarities and differences among between the above descriptions of a labor broker/customer relationship and the principal/agent relationship. Auger was sent by MTE to fill a temporary need at ABB on a time-only basis, that is, ABB paid "X rate for each hour each individual put in their plant." J.A. at 79. ABB had the power to discharge Auger and to not accept him as a worker. ABB paid MTE rather than paying Auger directly. In contrast, Arthur Boudreau, the MTE supervisor for the pipefitting operation, testified that, depending on the job, MTE provided some services on a time-only basis and other services on a time and materials basis.

J.A. at 144. As such, MTE is in the business of supplying labor, materials, or equipment, which goes beyond the typical labor broker services. Boudreau also testified that at ABB the employees were always working for MTE, under MTE control and supervision, just at a different location. J.A. at 146.

While at ABB, Auger worked under the direct supervision of Joseph Seedorf ("Seedorf"), an MTE supervisor, not under the supervision of ABB. Seedorf was on site and in charge of Auger's work. Auger reported to Seedorf at the beginning of his shift, received instructions as to how to do the job from Seedorf, sought Seedorf's approval and review of his work, and consulted with him regarding other tasks. ABB claims that its supervisor Brian Bourdeaux ("Bourdeaux"), had ultimate control over the MTE workers. The record reflects, however, that Bordeaux never actually communicated with Auger but invariably gave orders and instructions through Seedorf. In fact, there is no evidence that plaintiff was ever directly instructed or controlled by ABB's employees. Thus, there is also a clear question of control here.

This is the type of close factual case illustrated by the Michigan Supreme Court in *Clark*. *See* 594 N.W.2d at 454 (reasonable questions of which company hired worker, paid worker, and supervised worker are for trier of fact). The record does not indicate a distinct answer as to whether MTE was a labor broker or a subcontractor to ABB. Thus, a genuine issue of material fact exists as to whether MTE and ABB were in a labor broker/customer relationship or in a principal/agent relationship.

C. Economic reality test

The resolution of the labor broker/customer question is not the end point of

analysis. Auger further argues that under the "economic reality test" traditionally used by Michigan courts to determine employer/employee relationships, there are several genuine issues of material fact as to whether he was an employee of ABB such that the defendant is protected by the Act. We agree.

Under Michigan law, the economic reality test includes four elements: (1) control of a worker's duties; (2) the payment of wages; (3) the right to hire and fire and the right to discipline; and, (4) the performance of the duties as an integral part of the employer's business towards the accomplishment of a common goal. *Askew v. Macomber,* 398 Mich. 212, 247 N.W.2d 288, 290 (Mich.1976). No single element is controlling, and the totality of the circumstances must be considered to determine if the employer/employee relationship exists. *Farrell,* 330 N.W.2d at 403.

### 1. Control of Duties

Plaintiff and defendant agree that ABB retained *some* control over Auger. The pertinent question is the extent of that control. Auger argues that the amount of control exercised over him by ABB meets the minimum threshold for negligence liability under the doctrine of "retained control." He further asserts, however, that the facts create conflicting inferences as to the level of control such that it is unclear whether ABB was a co-employer. Therefore, he argues this question should go to a jury. By contrast, ABB asserts that it shared sufficient control over Auger and the other MTE workers that it was a "joint employer" with MTE and therefore protected by the Act.

Under Michigan law, control is a required element of a cause of action to impose negligence liability under the doctrine of "retained control." *Candelaria v. B.C. General Contractors, Inc.,* 236 Mich.

App. 67, 600 N.W.2d 348, 352 (Mich.Ct. App.1999). Under the doctrine, an owner or general contractor may be held liable if it exercises "at least partial control" over an independent contractor. *Burger v. Midland Cogeneration Venture,* 202 Mich. App. 310, 507 N.W.2d 827, 831 (Mich.Ct. App.1993). General oversight or monitoring of the subcontractor's employees is insufficient. *Id.* In addition, the control and direction must be over *"actual ... work,* which is not equivalent to safety inspection or oversight." *Samodai v. Chrysler Corp.,* 178 Mich.App. 252, 443 N.W.2d 391, 393 (Mich.Ct.App.1989) (emphasis in original). Moreover, the court must " 'carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking.' " *Smith v. Martindale,* 81 Mich.App. 682, 266 N.W.2d 49, 53 (Mich.Ct.App.1978) (quoting *Standard Oil Co. v. Anderson,* 212 U.S. 215, 222, 29 S.Ct. 252, 53 L.Ed. 480 (1909)).

In *Clark,* the Michigan Supreme Court addressed the question of whether dual employment status should be decided by a jury when the plaintiff raises factual questions regarding control under the economic reality test. 594 N.W.2d at 454. In that case, the plaintiff was the employee of a corporation but often worked at a sister company owned by the principal shareholders of the corporation. *Id.* at 453. Plaintiff was injured while working at the sister company (the defendant in the action) and defendant argued that it was a co-employer and therefore protected by the Act. *Id.* Plaintiff claimed that, although he was supervised by a company supervisor when on the company site, he was always subject to recall by his actual employer, the corporation. *Id.* Finding "numerous conflicting inferences" under the test, including which entity had the right

to supervise the plaintiff, the court held that whether plaintiff was an employee of the defendant was appropriately determined by a trier of fact rather than on summary judgment. *Id.*

Similarly, in *Smith*, the Michigan Court of Appeals also addressed the issue of control under the test. 266 N.W.2d at 53. In that case, a crane operation company supplied a crane and crane operator to the plaintiff's employer for use on a construction site. *Id.* at 51. The plaintiff was injured due to allegedly negligent operation of the crane by the leased operator. *Id.* The defendant claimed that the plaintiff and crane operator were co-employees because the crane operator was a "borrowed servant" of the plaintiff's employer and took directions from the employer. *Id.* The court determined that the crane and the crane operator were a leased unit and the plaintiff's employer had no control over the operator other than providing hand signals to direct the movement of the crane. *Id.* at 53. As such, the court reversed a grant of summary judgment for the defendants on the control issue.

In the present case, Auger was directly supervised on-site by Seedorf, the MTE supervisor. As stated above, although defendant claims that its supervisor Bourdeaux had ultimate control over the MTE workers, the record indicates that Bordeaux communicated with Auger through Seedorf. There is no evidence that plaintiff was ever directly instructed or controlled by ABB's employees. Nevertheless, the district court found that ABB possessed some level of retained or supervisory control over the plaintiff. The court concluded that punching the time clock, receipt of gate passes, the showing of safety videos, and the taking of a safety test established sufficient control to find that ABB was a co-employer of Auger as a matter of law and therefore entitled to

summary judgment. These elements cited by the district court are insufficient to resolve the control issue. *See Samodai*, 443 N.W.2d at 393 (owner must direct actual work, not just engage in safety inspections and general oversight). Under these facts, considerable uncertainty remains as to whether the degree of control retained by ABB rises to the requisite level for imposing liability on the defendant or absolves ABB from responsibility for Auger's injuries.

### 2. Payment of Wages

It is undisputed that MTE paid Auger's wages. ABB argues, however, that MTE was simply a "conduit" for ABB's payment to Auger. The district court held that ABB could have satisfied the payment of wages factor of the economic reality test by showing that ABB paid MTE on a time and materials basis and that Auger's wages came from ABB. In labor broker cases, courts have suggested that the "conduit" theory relied upon by ABB can supply a sufficient basis for finding payment. *See Kidder*, 564 N.W.2d at 879–80 (holding that labor broker was a payment conduit for defendant because the labor broker's workers worked for both the customer and the labor broker and that a labor broker and its customer both are subject to, and protected by, the exclusive remedy provision of the Worker's Disability Compensation Act). Under the "conduit" theory, a customer (in a labor broker scenario) does not pay the labor broker's workers directly. Instead, the customer reimburses the labor broker dollar for dollar for its services and the labor broker pays its workers' wages. *Id.* However, the reimbursement of wages in the "conduit" method is as much a typical incident of a "time and materials" contract—a contractor/subcontractor scenario—as it is of a labor broker-customer relationship. *Nat'l Micrograph-*

*ics Sys., Inc. v. United States,* 38 Fed. Cl. 46, 48 (1997).

A literal analysis of the language of the economic reality test suggests that this case should not be analyzed as a conduit scenario. Rather, this case is factually similar to *Smith,* in which the court said:

Martindale's wages were paid to him by R.L. White. White also deducted social security and income taxes from his check. Martindale did not receive any money from Freedland Steel. Freedland claims that it was required to pay R.L. White for the number of hours worked by Martindale at the construction site and that it was in effect paying Martindale's wages. However, we do not agree. Martindale was paid by a check issued by R.L. White and White was responsible for the withholding taxes. We hold that the most reasonable view of this relationship is that R.L. White paid Martindale's wages.

266 N.W.2d at 53. Here, MTE submitted invoices to ABB for the project labor. However, the Michigan Supreme Court has held that a general contractor is not the injured party's dual employer where the costs paid to the subcontractor included the plaintiff's salary, travel expenses, and workers' compensation premiums. *Schulte v. Am. Box Board Co.,* 358 Mich. 21, 99 N.W.2d 367, 368–69 (Mich.1959). In the instant case, it is unclear whether the fees that were paid to MTE included any overhead expenses.

In *Clark,* plaintiff was paid by his general employer. The defendant argued that the payroll check was funded by money generated by the defendant. Nonetheless, the Michigan Supreme Court held that a question of fact existed as to who paid the plaintiff because wages were derived from commingled funds of two companies. *Clark,* 594 N.W.2d at 454. Similarly, the Michigan Supreme Court has also held

that the payment of wages by an alleged dual employer is insufficient to find dual employment. *See Askew,* 247 N.W.2d at 290. (finding that plaintiff went "to the bank to receive her weekly pay, but the check was drawn on the employer's estate, a separate IRS account" and that such an arrangement "comprised no more than a transfer of the employer's funds to plaintiff."). In the instant case, it is unclear which company was actually responsible for the payment of Auger's wages. In light of this ambiguity, we lack sufficient evidence to draw a legal conclusion with regard to the payment of Auger's wages. Thus, the fact that MTE paid Auger's wages creates conflicting inferences: whether there was a labor broker relationship or whether a contractor/subcontractor relationship existed. Accordingly, this case should have been submitted to a jury because there are, at a minimum, conflicting inferences of who paid Auger's wages. The district court erroneously analogized this case to the labor broker line of cases because there is insufficient evidence to conclude that a labor broker was involved. At a minimum and consistent with *Clark,* the district court should have held that conflicting inferences with regard to wage payment could be derived from the facts and should have allowed the jury to decide the issue.

### 3. Right to Hire, Fire, and Discipline

The district court concluded that the evidence was uncontroverted that ABB met the hiring, firing and discipline prong of the economic realities test. On appeal, Auger argues that there was no evidence to contradict the fact that MTE was the only entity with the right to hire, fire and discipline him.

We believe that there are conflicting inferences with regard to this element of the economic reality test. First, Auger

was hired by MTE. ABB asserts, however, that it had the authority to fire Auger because it had the right to send Auger home. ABB bases its assertion on labor broker cases suggesting that the right to send an employee home is equivalent to firing. *See Kidder*, 564 N.W.2d at 881 (holding that defendant could accomplish indirectly that which it could not do directly and defendant had the right to order labor broker to remove unsatisfactory workers). Sending an employee home is not synonymous with firing. Firing is the cessation of employment. *See Wiltz v. M/G Transp. Servs., Inc.*, 128 F.3d 957, 963 (6th Cir.1997) (stating that the Department of Labor has explained that the term "termination" is "to have [its] common sense meaning" as the "permanent cessation of the employment relationship . . .") (quoting 54 Fed.Reg. 16,047 (1989)). In *Clark*, the Michigan Supreme Court found that the hiring by *one* entity was sufficient to create a question of fact even in the face of evidence that the plaintiff was hired to work for *both* entities. 594 N.W.2d at 454. In addition the court of appeals in *Smith*, held that objective facts relevant to this factor must be considered instead of an employer's inchoate unexercised rights. The court said:

> Thus, although Martindale could be asked to leave the job, any disciplining was up to White. We do not agree with defendants that the right of removal is equal to the right to fire, hire and discipline. The firing and discipline of Martindale was up to R.L. White, not Freedland.

*Smith*, 266 N.W.2d at 53. In the present case, ABB does not dispute that MTE had the ultimate authority to discipline Auger or that ABB never exercised its right to send an MTE pipe fitter home. These objective facts regarding this factor illustrate a genuine issue of a material fact as to who had the right to hire, fire and discipline Auger. Under the facts of the case before us, we are unable to infer that ABB could fire Auger. Accordingly, these conflicting inferences surrounding this factor require that the exclusive remedy issue be submitted to a jury.

Moreover, third-party liability cases also distinguish between the contractual right to discharge and the right to hire, fire and discipline. In *Erickson v. Pure Oil Corp.*, 72 Mich.App. 330, 249 N.W.2d 411 (Mich. Ct.App.1976), the evidence suggested that the defendant, pursuant to contract, reserved the right to terminate those who did not comply with its regulations. The Court of Appeals said:

> However, in order to retain effective control over the project, the owner must do more than retain contractual control. *Funk v. General Motors Corp.*, 392 Mich. 91, 106–08, 220 N.W.2d 641 (1974). If contractual control were held to be sufficient, nearly every owner of a construction site would be subject to liability for the on-the-site injuries to subcontractors' employees. We reach this conclusion since every owner retains the inherent right to discharge, subject to payment of damages, the general contractor who does not perform in accordance with the industry's standards.

*Id.* at 414–15. Moreover, in *Schulte*, the court held that even though the defendant retained by written contract the right to remove the plaintiff from the job, and to object to the plaintiff's conduct or workmanship, such evidence was insufficient to support the defendant's assertion that plaintiff was its employee. 99 N.W.2d at 368, 369.

The district court erroneously concluded that ABB had the right to discharge Auger. If the right to discharge is insufficient to support a finding of retained control, similarly, such a right is insufficient to

permit a finding, as a matter of law, of employer control sufficient to grant dual immunity. Based upon the facts in the record, we are unable to reach a dispositive conclusion with regard to which company—ABB or MTE—had the right to hire, fire, and discipline Auger because MTE hired Auger and possessed the sole authority to discipline him but ABB retained the right to send Auger home. Consequently, the district court should not have disposed of this issue as a matter of law. At a minimum, there was sufficient evidence of a conflicting inference regarding the degree of control that ABB and MTE could exercise. Accordingly, the district court's failure to submit this issue to the jury was in error.

### 4. Common Objective

The district court found that ABB could not have completed its project on time without employing MTE workers. The court concluded that since MTE workers were working towards the completion of the project, the common objective prong of the economic realities test was met.

Under the common objective prong, the relevant inquiry is "whose work is being done?" *See Buskirk v. Ide*, 302 Mich. 154, 4 N.W.2d 504, 508 (Mich.1942). ("The controlling factor is: For whom is the work being performed, and who had the power to control the work and the employee?"). In the present case, MTE was hired to do pipe fitting for ABB after it became apparent that J & J Hydraulics ("J & J") could not finish its contracted work in a timely fashion. Effectively, ABB hired MTE to perform the very task for which J & J had a fixed sum contract to perform. Thus, it is clear that ABB and MTE were working towards the common objective of completing the General Motors project.

### 5. Totality of the circumstances

Although Michigan law requires that a labor broker/customer relationship exist as a condition precedent to application of the economic reality test, the district court failed to ascertain whether MTE was a labor broker. Instead, the district court analyzed this case under the economic reality test without the requisite preliminary determination of MTE's status as a labor broker. We believe that the district court erred by applying case law dependent upon a labor broker/customer relationship before determining whether MTE was a labor broker. This factual determination is essential to the proper outcome of this case.

Moreover, in the instant case, the status of ABB as plaintiff's employer is not reasonably susceptible to a single inference. The facts in the record create conflicting inferences as to whether ABB was a general contractor or whether ABB was a customer. Even if ABB meets the right to hire, fire and discipline and common objective prongs of the economic reality test, the facts relevant to the other two factors of the test are susceptible of conflicting inferences. Under the facts of this case, it is unclear that ABB's control is sufficient to meet the economic reality test as a matter of law. In addition, the facts are insufficient to support a finding that ABB paid Auger's wages. Although we cannot definitively assert that a contractor/subcontractor relationship exists in this case, at a minimum, analysis of the facts show conflicting inferences on the issue of dual employment. Where, as here, there are conflicting inferences on the issues of control and, payment, Michigan law mandates that the issue of dual employment status be submitted to a jury. Therefore, the district court's order of summary judgment was erroneous.

### III. CONCLUSION

Accordingly, we reverse the district court's judgment and remand this case for jury trial on the exclusive remedy issue in accordance with Michigan law.

DAVID A. NELSON, Circuit Judge, dissenting.

DAVID A. NELSON, Circuit Judge.

The record of this case, as I read it, leaves no room for doubt that insofar as the GM production line project was concerned, the relationship between MTE Controls and ABB Flexible Automation was that of labor broker/customer. None of the pertinent facts is in dispute—and the facts, in my judgment, compel the conclusion as a matter of law that MTE was acting as a labor broker at the time of plaintiff Auger's accident.

When Michigan's "economic reality test" is applied to the undisputed facts, it seems equally clear to me that both MTE (the labor broker) and ABB (the customer) qualified under Michigan law as co-employers of Mr. Auger. If I am correct in this, ABB's co-employer status meant that the exclusive remedy provision of the Michigan Worker's Disability Compensation Act, M.C.L. § § 418.131, insulated ABB from liability for Mr. Auger's injury.[1] Accordingly, although my reasoning differs somewhat from that of the district court, I would affirm the judgment entered by the district court in favor of ABB.

### I

Under date of March 12, 1998, MTE sent ABB a one-page letter offering to furnish machine tool hydraulic pipefitters and mechanical assemblers for temporary work in ABB's plant at hourly rates specified in the letter. The rates quoted were to be "valid until December 1, 1998," the letter stated, based on "2 or more men" and "weekly invoicing." No subcontract was proposed, and no subcontract was entered into.

MTE's offer was not tied to any given project, such as the engine block line that ABB was assembling in the spring of 1998 for installation at a General Motors plant in China. ABB found itself behind schedule on the GM project, however, and over the course of 16 consecutive weeks that ended on June 26, 1998, ABB made a series of oral requests to MTE for temporary workers to help on the project. The number of temporary workers to be supplied varied in accordance with ABB's changing needs.

The hours worked by the temporary employees were accounted for on a daily basis. Pursuant to MTE's March 12 letter, ABB was invoiced for the workers' time on a weekly basis. Typical of the 16 invoices issued by MTE in connection with the GM project is Invoice No. 1233, dated June 1, 1998. This invoice shows a total dollar amount of $2,080 due from ABB for "1 lot of labor for 5/18 thru 5/23/98." Neither in this invoice nor in any of the other 15 invoices contained in the record was ABB charged anything for materials; all of the charges were for temporary labor, pure and simple. The charges ranged from a high of $8,143.75 for the period of 3/16 through 3/21 to a low of $1.000 for the period of 4/13 through 4/17.

The Friday of the week covered by Invoice No. 1233—May 22, 1998—was the first day that Mr. Auger was assigned to work at the ABB plant. Unfortunately, it proved to be his last day at the plant as

---

1. MCL § 418.131(1) provides in pertinent part that "[t]he right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury...."

well; Mr. Auger was seriously injured only hours after he clocked in that afternoon.

The "working leader" or straw boss who gave Mr. Auger his work assignment on the afternoon in question was an MTE employee named Joseph Seedorf. (Mr. Seedorf's time, like that of other working leaders, was billed to ABB at a higher hourly rate than that charged for workers such as Mr. Auger.) Mr. Seedorf testified that Brian Bordeaux, an ABB supervisor, would tell him on a daily basis what tasks were to be performed by the temporary help; Seedorf, in turn, would "communicate these tasks to the MTE employees." Brian Bordeaux was free to change his mind about the tasks planned for a given day, and he could tell Seedorf to send men home if a change in plans meant that they were not needed. As Seedorf explained, "he [Bordeaux] could send anybody home he wanted to at any time."

Mr. Seedorf also testified that employees of ABB had the right to give direct instructions to MTE workers without going through Seedorf. As far as Mr. Seedorf personally was concerned, moreover, he "was to follow all [ABB] instructions, no matter what ... [T]hey could ask me to sweep the floor and I would sweep the floor. I am basically paid by MTE Controls *working for ABB as well as everyone else from MTE that was in that building."* (Emphasis supplied.)

MTE supervisor Arthur Boudreau (not to be confused with ABB supervisor Brian Bordeaux) confirmed that the "ABB leaders maintained control over what was going on at the plant concerning the construction of [the General Motors] conveyor." Arthur Boudreau saw ABB leaders giving directions to temporary workers on the floor "quite often," in fact.[2] And the plaintiff's own brother, who was also assigned to ABB as a temporary worker, testified that there were many occasions on which ABB supervisor Brian Bordeaux had given him working orders directly, without going through an MTE lead man.

All this is undisputed. It is also undisputed that ABB had the right to discipline MTE workers for their performance, attitude, and the like, just as it had the right to specify that a particular MTE employee should no longer be assigned to the project. And it is undisputed, finally, that ABB and MTE were working toward a common objective—the timely completion of the assembly line for GM. ABB's goal was to get paid for performance of its contractual obligations to General Motors, and in this connection both ABB and MTE stood to profit from the efficient matching of temporary workers and temporary work needs in a way that would get the job done on time and in a cost effective manner. Under Michigan law, as I understand it, the facts outlined above clearly made MTE a labor broker insofar as its relationship with ABB on the General Motors project was concerned—and I believe that the economic reality of the situation was such that Michigan law would clearly treat Mr. Auger as having dual employers.

## II

The landmark case of *Renfroe v. Higgins Rack Coating & Mfg. Co.*, 17 Mich. App. 259, 169 N.W.2d 326 (1969), was a personal injury case brought against a manufacturer (Higgins Company) by an employee of a labor broker (ETS) who had been hurt in an industrial accident on Hig-

---

**2.** Arthur Boudreau also testified that ABB specified the number of MTE workers needed from time to time, the number of hours these workers would be used on a particular job, the type of shift, and when and how the work would be done. "Brian [Bordeaux] would have ultimate control over my people," Arthur Boudreau said.

gins' premises. The injured man had recovered workman's compensation benefits for his injury, and Wayne County Circuit Court Judge James L. Ryan (now a distinguished member of the United States Court of Appeals for the Sixth Circuit) entered a summary judgment holding as a matter of law that Higgins Company "was an 'employer' of [the injured worker] within the meaning of the workmen's compensation laws so as to make [the worker's] recovery under those laws exclusive...." 17 Mich.App. at 261, 169 N.W.2d at 327. Judge Ryan's judgment was unanimously affirmed by the Michigan Court of Appeals.

Analyzing the case under Michigan's "economic reality" test, the court of appeals expressed itself as follows:

> "For ETS, economic reality is based on the fact that a profit can be made by efficiently matching workers with temporary work needs. ETS maintained control of the workers by its practice of daily reassignment and daily payment at its offices. It also maintained the formalities of employment by handling all paper work and payments incident to the employment.

> "The Higgins Co., in return for a set fee, received a daily worker who it could and did direct among various tasks in its factory. It also received the services of ETS in handling all the aforementioned paper work incident to the employment, including the making of workmen's compensation premium payments. However, it is perfectly clear that the money for those payments came directly from the fee which Higgins paid, and was one of the expenses included in calculating that fee. [Footnote omitted.]

> "The economic reality of this case is that both ETS and Higgins Co. were employers of Roy Renfroe, each in a different way. It is not necessary to make fine semantic distinctions as to types [or] degrees of control, etc. It is enough to say that either could be liable under the workmen's compensation act, therefore, both are protected by it." 17 Mich.App. at 266–67, 169 N.W.2d at 329–30.

In *Smith v. Martindale,* 81 Mich.App. 682, 266 N.W.2d 49 (1978)—a case decided nine years after *Renfroe*—a different Michigan Court of Appeals held that a general contractor who had rented the use of a crane and its operator from another company did not become the employer of the crane operator under the loaned servant doctrine. There may be some tension between the result reached in *Smith* and the result reached in *Renfroe,* but in both cases the identification of the employer was held to be a question of law for decision by the court and not a question of fact for resolution by the jury.

Any tension between *Renfroe* and *Smith* appears to have been resolved by the Michigan Supreme Court's subsequent decision in *Farrell v. Dearborn Mfg. Co.,* 416 Mich. 267, 330 N.W.2d 397 (1982). There, without so much as citing *Smith,* the Supreme Court explicitly endorsed both the "reasoning" and the "result" of the *Renfroe* decision. See 416 Mich. at 277, 330 N.W.2d at 400.

Three of the four cases consolidated in *Farrell* involved a labor broker—described by the Supreme Court as "a company engaged in the business of furnishing employees to others," 416 Mich. at 272, 330 N.W.2d at 398—and the *Farrell* Court saw the economic reality of the labor broker/customer situation in exactly the same way that the *Renfroe* court had. Accordingly, the Supreme Court held "that the exclusive remedy available to the employee in a labor broker situation is provided by the workers' compensation statute and that a separate tort action against the customer of the labor broker may not be

maintained." 416 Mich. at 278, 330 N.W.2d at 401.

Summary judgments against labor broker employees who had brought tort actions against the brokers' customers were likewise affirmed by the Michigan Supreme Court in *Kidder v. Miller–Davis Co.*, 455 Mich. 25, 564 N.W.2d 872 (1997). Although the Court there stopped short of holding that a labor broker/customer relationship will *always* establish dual employer status as a matter of law, see 455 Mich. at 40 n. 7, 564 N.W.2d at 879 n. 7, the extent of the relationship between the two companies in *Kidder* and the economic realities of the situation in that case were such that the Court had no hesitancy in concluding—as a matter of law—"that a dual or coemployer relationship was formed, precluding a separate tort action against the customer of the labor broker." 455 Mich. at 40, 564 N.W.2d at 879.

The similarities between the facts in *Kidder* and the facts in the case at bar are striking. In *Kidder*, as here, no bids were solicited or received on a subcontract. The labor broker's customer did not relinquish its ultimate supervision or control of the work site, and the broker provided temporary workers pursuant to job description requests that the customer furnished from time to time. Billing for the temporary workers was on a weekly basis. The customer furnished appropriate tools, controlled the hours on the job, and told the workers each day where they would be working. Although the customer could not directly hire or fire any of the temporary workers, it was undisputed that the broker would remove any personnel the customer deemed unsatisfactory. In these and other respects, the undisputed facts in *Kidder* are indistinguishable from the undisputed facts of the case before us now. And against this factual background, *Kidder* reiterated *Renfroe'*s observation that "[i]t is not necessary to make fine semantic distinctions as to type [or] degrees of control, et cetera." 455 Mich. at 44, 564 N.W.2d at 880.

*Clark v. United Technologies Automotive, Inc.*, 459 Mich. 681, 594 N.W.2d 447 (1999), on which my colleagues rely heavily, was not a labor broker case at all. It was hard to say, in *Clark*, which of two closely related businesses had hired the plaintiff, just as it was uncertain who paid him and who had the right to supervise him, fire him, or otherwise discipline him. The opinion in *Clark* cites both *Farrell* and *Kidder* with evident approval, and it does not purport to modify either decision in any way. I have rather more difficulty than my colleagues do in seeing how *Clark* has much relevance to the case at bar.

It is true that *Clark* can be read as suggesting that summary judgment is inappropriate, under Michigan law, where, although the facts are undisputed, conflicting inferences can be drawn from those facts. This used to be the rule in our court too. See *S.J. Groves & Sons Co. v. Ohio Turnpike Commission*, 315 F.2d 235 (6th Cir.), *cert. denied*, 375 U.S. 824, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963). But a subsequent amendment to Fed.R.Civ.P. 56(e) and the sea change in federal summary judgment jurisprudence wrought by *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), now make it crystal clear that where the relevant facts are not in dispute, the existence of room for disagreement as to the inferences to be drawn from such facts does "not demonstrate a genuine issue of material evidentiary fact, but instead illumi-

nate[s] the ultimate legal issues to be resolved." *Cincinnati Newspaper Guild, Local 9 v. Cincinnati Enquirer, Inc.,* 863 F.2d 439, 443 (6th Cir.1988) (quoting *Chauffeurs Teamsters and Helpers v. C.R.S.T., Inc.,* 780 F.2d 379, 381 (8th Cir. 1985)).

In the case at bar the facts regarding plaintiff Auger's employment status are clear and undisputed. *Clark* may suggest that the potential for drawing conflicting inferences from those facts would preclude summary judgment under Michigan law, but the standard to be applied here is one of federal law: "When there is a motion for summary judgment in a diversity case, the provisions of Rule 56 [of the Federal Rules of Civil Procedure] control its determination." *Gafford v. General Electric Co.,* 997 F.2d 150, 166 (6th Cir.1993) (quoting *Reid v. Sears Roebuck and Co.,* 790 F.2d 453, 459 (6th Cir.1986)).

For these and other reasons on which I might have expanded had time permitted,[3] I would affirm the judgment in favor of ABB. My colleagues on the panel having taken a different view of the matter, I respectfully dissent.

---

**3.**  Judge Jones circulated his proposed majority opinion to the other members of the panel on March 26, 2002, and he has announced his resignation from the office of circuit judge with an effective date that makes it incumbent on the panel to decide this case no later than March 29, 2002.